### ROTH v. GOLDMAN.
### No. 152, Docket 21210.

United States Court of Appeals
Second Circuit.

Feb. 8, 1949.

---

[1] The judgment was that appellant take nothing, and that appellee recover costs of appellant.

[2] 26 U.S.C.A. §§ 1–476.

[3] 26 U.S.C.A. §§ 331–340.

[4] See subsection (d) of § 102.

[5] See Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A.

Harry Rappaport, of New York City, for plaintiff-appellant.

Harold J. Raby, Asst. U. S. Atty., of New York City (John F. X. McGohey, U. S. Atty., of New York City, on the brief), for defendant-appellee.

Before AUGUSTUS N. HAND, CLARK, and FRANK, Circuit Judges.

PER CURIAM.

■ This injunction action serves to bring up for review the validity of five orders of the Postmaster General, entered after administrative proceedings and hearings, excluding from the mails three books published by plaintiff under various trade names. The vagaries of censorship are perhaps suggested by the fact that only one of these books was excluded as "obscene, lewd, or lascivious," 18 U.S.C.A. §§ 334, 339 [now §§ 1461, 1342], 39 U.S.C.A. § 255, while all material concerning the others was held unmailable because of the steps taken to secure mail orders for them by fraudulently advertising them to be salacious when they were not. 39 U.S.C.A. §§ 259, 732. The orders involving these lat-

ter books actually cause us the less difficulty just because the standards of fraud are at least somewhat clearer than those of obscenity. There can be little doubt of the misleading character of the condemned advertising or of the sufficiency of the evidence to sustain these administrative findings.

■ The other order, based upon a finding of obscenity as to a single book, naturally presents more of a problem because of the imprecise judicial meaning of the statutory terms and the many doubts now held as to the feasibility of administrative or judicial review of book publishing mores and standards. Involved here is a collection of some ninety-six "waggish tales," supposed to have been brought down to us from another era and another clime, and sold through the mails at the special discount of $10 from the listed $20 per volume. Our task is not made easier, however, when we discover them to be American-made or shared smoking room jests and stories, obscene or offensive enough by any refined standards and only saved, if at all, by reason of being both dull and well known. It is urged that such material is not of the sort to stimulate lust. Waiving the question how a court may test such a claim, we may suggest the curious dilemma involved in a view that the duller the book, the more its lewdness is to be excused or at least accepted. If under existing decisions, however, there be some reason to suppose that only books which are dull and without substantial literary merit will be suppressed, it may be answered that within limits it perhaps is not unreasonable to stifle compositions that clearly have little excuse for being beyond their provocative obscenity and to allow those of literary distinction to survive. But in any event, decision under the law here applicable is committed in the first instance to an administrative official; and under normal rules, therefore, judicial review channelled within the confines of a plea for an injunction should not be overextensive. Certainly material such as this does not afford much stimulus or basis for a finding of abuse of administrative discretion or power

Affirmed.

FRANK, Circuit Judge (concurring).

This is the first case in which I have sat where the validity of an administrative order suppressing a book allegedly obscene has been contested. Because of my judicial inexperience in this field, I yield in this case to the more experienced judgment of my colleagues. But I do so with much puzzlement, and with the hope that the Supreme Court will review our decision, thus dissipating the fogs which surround this subject. For, as I shall try to show, those fogs are indeed thick, and I find no clear light penetrating them either in my colleagues' opinion in this suit or elsewhere.

My private tastes are such that I think the American people will suffer no great loss if deprived of the opportunity to read Waggish Tales from the Czechs. But far more is here involved than this particular book: Our decision will become a precedent—in a circuit which includes America's great publishing center—affecting the exercise of the right of free press guaranteed by the First Amendment. Our decision may put in peril other writings, of a higher order of excellence, which any man who happens at the moment to be Postmaster General happens to find offensive.

For my colleagues allow small room for court review, saying that the determination of obscenity "is committed in the first instance to an administrative official; and, under normal rules, therefore, judicial review channeled within the confines of a plea for an injunction [1] should not be overextensive." That ruling vests immense administrative censorship authority in one fallible man, makes him an almost despotic arbiter of literary products. If one day he bans a mediocre book, another day he may do the same to a work of genius. Originality is not so common that we should lightly contemplate its potential stifling. And censorship does more than to keep finished books from being sold: it keeps many from ever being written. Tolstoy and other Russians of the Czarist era have told how fear of the censor impeded their creative writing. An American author's imagination may be severely cramped if he must write with one eye on the Postmaster General; authors must cope with publishers who, uncertain about that official's judgment, may refuse to accept the manuscripts of contemporary or future Shelleys or Whitmans.

Such a condition is compatible with the ideologies of Hitlers,[2] Czars and Commissars. It does not accord with democratic ideals which repudiate thought-control. "Freedom of thought," it has been wisely said, " * * * is worthless unless it goes with freedom of expression. Thought is impossible without expression; thought is expression; an unexpressed thought, like an unlaid egg, comes to nothing. Given this freedom, then, other freedoms follow." [3] The "right of expression beyond the conventions of the day," wrote Mr. Justice Frankfurter three years ago, is "the very basis of a free society." [4] It would seem desirable that, in this industrial age, when economic pursuits will, perforce, become increasingly regulated by government, the realm of art should remain free, unregimented, the domain of unrestricted competition, free enterprise, and unhampered individual initiative at its maximum.[5] De gustibus non disputandum represents a cherished democratic maxim. Governmental control of the individual's taste may insidiously expand into menacing widespread anti-democratic practices. "Man," warned Goethe, "is easily accustomed to slavery and learns quickly to be obedient when his freedom is taken from him."

In that vein, President Franklin Roosevelt said: "The arts cannot thrive except where men are free to be themselves and to be in charge of the discipline of their

---

[1] I am unaware of any means of review under this statute other than a suit for injunction.

[2] Cf. Timasheff, The Legal Regimentation of Culture in National Socialist Germany, 11 Fordham L.Rev. (1942) 1.

[3] Kallen, The Liberal Spirit (1948) 133.

[4] Frankfurter, J., concurring in Hannegan v. Esquire, Inc., 327 U.S. 146, 159, 160, 66 S.Ct. 456, 463, 90 L.Ed. 586.

The Justice substantially reiterated those views the other day in his concurring opinion in Kovacs v. Cooper, 69 S.Ct. 448.

[5] See Frank, Fate and Freedom (1945) 194–202.

own energies and ardors. The conditions for democracy and for art are one and the same. What we call liberty in politics results in freedom in the arts. * * * American artists * * * have no compulsion to be limited in method or manner of expression."[6] Disturbed by the way my colleagues' ruling runs counter to that ideal, I think it not inappropriate to ask some questions.

1. In the light of the First Amendment, it is not, I think, frivolous to ask a question about the constitutional power of Congress to authorize an official to bar from the mails, and probably thus largely to suppress, any book or writing he finds obscene. For Mr. Justice Holmes, dissenting, with Mr. Justice Brandeis' concurrence, in Leach v. Carlile, 258 U.S. 138, 140, 141, 42 S.Ct. 227, 229, 66 L.Ed. 511, asserted the unconstitutionality of one of the very suppression statutes before us in this case,[7] for the reason that the First Amendment was "intended to prevent restraints"[8] except those needed "for the safety of the nation."[9] Mr. Justice Frankfurter, concurring in Hannegan v. Esquire, Inc., 327 U.S. 146, 160, 66 S.Ct. 456, 90 L.Ed. 586, cited with approval the dissent in Leach v. Carlile. The majority of the Court in the Esquire case, speaking through Mr. Justice Douglas, remarked, 327 U.S. 156, 66 S.Ct. 461, that "grave constitutional questions are immediately raised once it is said that the use of the mails is a privilege which may be extended or withheld on any grounds whatsoever."[10] It is germane here that several times the Supreme Court has with seeming approval referred to the distinction first proposed by Mr. Justice Stone in United States v. Carolene Products Co., 304 U.S. 144, 152 note, 58 S.Ct. 778, 783, 82 L.Ed. 1234: "There may be a narrower scope for operation of the presumption of constitutionality when legislation appears on its face to be within a specific prohibition of the Constitution, such as those of the first ten Amendments. * * *" See Thomas v. Collins, 323 U.S. 516, 529, 530, 65 S.Ct. 315, 89 L.Ed. 430; cf. Thornhill v. Alabama, 310 U.S. 88, 95, 60 S.Ct. 736, 84 L.Ed. 1093; Schneider v. State, 308 U.S. 147, 161, 60 S.Ct. 146, 84 L.Ed. 155; Herndon v. Lowry, 301 U.S. 242, 258, 57 S.Ct. 732, 81 L.Ed. 1006; Bridges v. California, 314 U.S. 252, 262, 263, 62 S.Ct. 190, 86 L.Ed. 192, 159 A.L.R. 1346; Skinner v. Oklahoma, 316 U.S. 535, 543, 544, 62 S.Ct. 1110, 86 L.Ed. 1655; Kovacs v. Cooper, 69 S.Ct. 448, 458. Some there are who doubt the wisdom of that distinction;[11] but members of an inferior court, like ours, may not judicially act on such doubts. Mr. Justice Frankfurter, concurring in the recent Kovacs case, objected to what he described as the oversimplified and dogmatic formulation of the distinction; yet he said that, since "without freedom of expression, thought becomes checked and atrophied," he would adhere to the views of Mr. Justice Holmes who "was far more ready to find legislative invasion [of the Constitution] where free inquiry was involved than in the debatable area of economics."

If we were dealing here with that part of the statute providing not for ad-

---

[6] Message at dedicating exercises of the New York Museum of Modern Art, May 8, 1939.

[7] 39 U.S.C.A. § 259 (Rev.St.3929).

[8] See Patterson v. Colorado, 205 U.S. 454, 462, 27 S.Ct. 556, 51 L.Ed. 879, 10 Ann.Cas. 689, per Holmes, J.; Grosjean v. American Press, 297 U.S. 233, 249, 56 S.Ct. 444, 80 L.Ed. 660; Lovell v. Griffin, 303 U.S. 444, 451, 452, 58 S.Ct. 666, 82 L.Ed. 949.

[9] Holmes, J., there said: "I do not suppose that anyone would say that the freedom of written speech is less protected by the First Amendment than the freedom of spoken words. Therefore I cannot understand by what authority Congress undertakes to authorize anyone to determine in advance, on the grounds before us, that certain words shall not be uttered. Even those who interpret the Amendment most strictly agree that it was intended to prevent previous restraints. We have not before us any question as to how far Congress may go for the safety of the nation."

[10] The Court cited "the dissents of Mr. Justice Brandeis and Mr. Justice Holmes in United States ex rel. Milwaukee Social Democratic Publishing Co. v. Burleson, 255 U.S. 407, 421, 423, 430–432, 437, 438, 41 S.Ct. 352, 357, 358, 360, 361, 363, 65 L.Ed. 704."

[11] See discussion in Clark, The Dilemma of American Judges, 35 Am. Bar Ass'n. J. (1949), 8, 10, 11.

ministrative suppression of an obscene book but for criminal punishment of one who had already published it, the question might be different (although in a case a few weeks ago, four Supreme Court Justices, out of the eight who participated, may perhaps have held even such punitive legislation, enacted by a State, violative of the constitutional right of free press and free speech [12]).

The "safety of the Nation" exception would today, I think, be given a broader interpretation than Holmes'. It would, for example, include readily demonstrable social mischiefs such as commercial fraud and the like.[13] It would doubtless justify suppression of a book if there were a "clear and present danger" that its words would bring about grave "substantive evils" adversely affecting the public interest.[14] In terms of that exception, it may be urged that the reading of obscene books demonstrably entails such socially dangerous effects on normal persons [15] as to empower Congress, notwithstanding the First Amendment, to direct suppression of those writings.

I think that no sane man thinks socially dangerous the arousing of normal sexual desires. Consequently, if reading obscene books has merely that consequence, Congress, it would seem, can constitutionally no more suppress such books than it can prevent the mailing of many other objects, such as perfumes, for example, which notoriously produce that result. But the constitutional power to suppress obscene publications might well exist if there were ample reason to believe that reading them conduces to socially harmful sexual conduct on the part of normal human beings. However, convincing proof of that fact has never been assembled. It may be exceedingly difficult to obtain. Perhaps in order to be trustworthy, such proof ought to be at least as extensive and intensive as the Kinsey Report.[16] Macaulay, replying to demands for suppression of obscene books, said: "We find it difficult to believe that in a world so full of temptations as this, any gentleman, whose life would have been virtuous if he had not read Aristophanes and Juvenal, will be made vicious by reading them." Substitute "Waggish Tales from the Czech" for "Aristophanes and Juvenal," and those remarks become relevant here.

Psychological studies in the last few decades suggest that all kinds of stimuli—for instance, the odor of lilacs or old leather, the sight of an umbrella or a candle, or the touch of a piece of silk or cheese-cloth—may be provocative of irregular sexual behavior in apparently normal men,[17]—for all we know, far more provocative than the reading of obscene books. Perhaps fur-

[12] See Doubleday & Co., Inc., v. New York, 335 U.S. 848, 69 S.Ct. 79, affirming, by a divided Court and without any opinions, 297 N.Y. 687, 77 N.E.2d 6. Mr. Justice Frankfurter took no part in the decision.

[13] Donaldson v. Read Magazine, 333 U. S. 178, 68 S.Ct. 591.

[14] See Bridges v. California, 314 U.S. 252, 261–263, 62 S.Ct. 190, 86 L.Ed. 192, 159 A.L.R. 1346; Thornhill v. Alabama, 310 U.S. 88, 104, 105, 60 S.Ct. 736, 84 L.Ed. 1093; Herndon v. Lowry, 301 U. S. 242, 258, 57 S.Ct. 732, 81 L.Ed. 1066; Thomas v. Collins, 323 U.S. 516, 529, 530, 65 S.Ct. 315, 89 L.Ed. 430.

[15] As noted below, the courts in the obscenity cases now refer to the reactions of normal persons.

[16] "Interestingly enough," we are told, "New Mexico has no obscenity law, and does not seem to feel handicapped by the lack of one. As a footnote to sexual behavior, it would be instructive to discover * * * whether the sexual pattern of the people of New Mexico is substantially different from that of other people who have enjoyed the 'protection' of State censorship of printed materials on grounds of obscenity." Ernst and Loth, American Sexual Behavior and The Kinsey Report (1948) 129.

[17] "The psychiatrist and psychologist fail to find any sharp distinction between * * * apparently abnormal traits, on the one hand, and similar, though less marked, traits in normal people. The psychoneurotic and insane are, so to speak, 'more so.'" Gardner Murphy, in the Introduction to An Outline of Abnormal Psychology (1929).

See also West, Conscience and Society (1945), a book by a psychiatrist well versed in matters legal, which contains discussions, cautiously phrased, helpful to lawyers interested in the pull of the unconscious motivations of normal human

ther research will disclose that, for most men,[18] such reading diverts from, rather than stimulates to, anti-social conduct[19] (which, I take it, is what is meant by expressions, used in the cases, such as "sexual impurity," "corrupt and debauch the minds and morals"[20]).

Some dictionary definitions of "obscene" —as "disgusting," "loathesome," "repulsive"—may suggest that there is serious social danger, constitutionally justifying suppression, in the shock of obscene writings to normal susceptibilities. But there are indications that Thomas Jefferson[21]

---

beings; see especially pp. 158, 161-165, 219, 222, 231.

Of course, psychiatry is not an infallible science but an art still in its period of adolescence, and, with many psychiatrists, tainted by a superfluous deterministic philosophy. See Frank, Law and The Modern Mind (1930) 21 note, 359-360; Frank, Fate and Freedom (1945) 64-69; cf. Hall, Principles of Criminal Law, (1947) Ch. 14.

[18] Alpert, Censorship and The Press, 52 Harv.L.Rev. (1938) 40, 72: "Over ten years ago the Bureau of Social Hygiene of New York City sent questionnaires to ten thousand college and normal school women graduates. Twelve hundred answers were received; and of those seventy-two persons who replied that the source of their sex information came from books, mentioning specific volumes, not one specified a 'dirty' book as the source. Instead, the books listed were: the Bible, the Dictionary, the Encyclopaedia, novels from Dickens to Henry James, Shakespeare, circulars for venereal diseases, medical books, and Motley's Rise of the Dutch Republic. In answer to the question of what things were most stimulating sexually, of the 409 replies, 9 said 'Music,' 18 said 'Pictures,' 29 said 'Dancing,' 40 said 'Drama,' 95 said 'Books,' and 218 noted very simply 'Man.' "

[19] Alpert writes of the American Youth Commission study of the conditions and attitudes of young people in Maryland between the ages of sixteen and twenty-four, as reported in 1938: "For this study Maryland was deliberately picked as a 'typical' state, and, according to the Commission, the 13,528 young people personally interviewed in Maryland can speak for the two hundred and fifty thousand young people in Maryland and the twenty millions in the United States. The chief source of sex "education" for the youth of all ages and all religious groups was found to be the youth's contemporaries. * * * Sixty-six percent of the boys and forty percent of the girls reported that what they knew about sex was more or less limited to what their friends of their own age had told them. After "contemporaries" and the youth's home, the source that is next in importance is

the school, from which about 8 percent of the young people reported they had received most of their sex information. A few, about 4 percent, reported they owed most to books, while less than 1 percent asserted that they had acquired most of their information from movies. Exactly the same proportion specified the church as the chief source of their sex information.' These statistical results are not offered as conclusive; but that they do more than cast doubt upon the assertion that 'immoral' books corrupt and deprave must be admitted. These statistical results placed in the scale against the weight of the dogma upon which the law is founded lift the counterpan high. Add this: that 'evil manners' are as easily acquired without books as with books; that crowded slums, machine labor, barren lives, starved emotions, and unreasoning minds are far more dangerous to morals than any so-called obscene literature. True, this attack is tangential, but a social problem is here involved, and the weight of this approach should be felt. The counterpan is lifted a trifle higher". Id. at 74.

[20] See Swearingen v. United States, 161 U.S. 446, 451, 16 S.Ct. 562, 564, 40 L.Ed. 765; Dysart v. United States, 272 U.S. 655, 657, 47 S.Ct. 234, 71 L.Ed. 461. In the Swearingen case, 161 U.S. at page 450, 16 S.Ct. at page 563, 40 L.Ed. 765, the Court said that the words "obscene, lewd or lascivious" are "used in the statute, as describing one and the same offense."

[21] In Jefferson's Second Inaugural Address, March 4, 1805, he referred to articles published in the press, during his first administration, "charged with whatsoever its licentiousness could devise or dare." He said that libel suits were the proper redress, adding that "the press * * * needs no other legal restraint, * * * and no other line can be drawn between the inestimable liberty of the press and its demoralizing licentiousness. If there be still improprieties which this rule would not restrain, its supplement must be sought in the censorship of public opinion."

Previously, in 1776, in his draft of a proposed Constitution for Virginia, he

and James Madison,[22] no mean authorities when it comes to interpreting the First Amendment, recognized no such limitations on the free-press right.

It is not altogether impossible, then, that the Supreme Court, following the lead of Mr. Justice Holmes and Mr. Justice Brandeis, will strike down this suppression statute.[23] But I do not venture so to prophesy.

2. If, however, it be true that "grave constitutional questions are immediately raised" by a statute authorizing an official to suppress books,[24] one would suppose that such a statute, verging as it does on unconstitutionality, should at least contain unusual safeguards against arbitrary official incursions on the rights guaranteed by the First Amendment, and should be strictly interpreted [25] so as to preclude doubts about its validity. To avoid unconstitutionality it might seem that the statute should provide some fairly precise standard to guide the officials' action, a standard far more precise than is necessary in those statutes, providing for administrative action, which do not come close to the very edge of constitutional power. If anyone regards as precise the standard in the obscenity statute, he cannot have read the pertinent cases. For see: At one time, the courts held that the existence of obscenity turned on the subjective intention of the author, regardless of the book's probable effect on readers. This test has now been abandoned; now the courts consider solely the author's "objective" intention, which equates with the book's effect on others.[26] In other words, an author does not violate an obscenity statute if he writes and publishes a dainty ditty which he alone, of all men, believes obscene; his private, unsuccessfully communicated, thought and purposes are not a wrong.[27] Also, at one time, a writing was held obscene if it would probably have a socially undesirable effect on the abnormal; but now the test has shifted and become that of the way the words will probably affect normal persons.[28] A standard so difficult for our ablest judges to interpret is hardly pre-

---

had included this statement: "Printing-presses shall be free, except so far as by commission of private injury cause may be given of private action."

See Berman, Thomas Jefferson Among The Artists (1947) 250-251: "He violently opposed censorship of books, coming to the defense of the bookseller Dufief when the latter was threatened with prosecution for selling De Becourt's Sur la Creation du Monde, saying that he was 'really mortified to be told that, in the United States of America * * * a question about the sale of a book can be carried before the civil magistrate.' So, too, he uncompromisingly defended the freedom of the press, even though he himself was the victim of as unscrupulous, as venal and mendacious a press as ever in our history assailed the character of a great public figure. 'Where the press is free, and every man able to read, all is safe,' he told Col. Yancey [1816] * * * 'The force of public opinion cannot be resisted, when permitted to be freely expressed. * * * Were it left to me whether we should have a government without newspapers or newspapers without a government, I should not hesitate a moment to prefer the latter.'" [1809].

[22] Madison, writing of guaranties of press freedom in State Constitutions, said: "Some degree of abuse is inseparable from the proper use of anything. It has accordingly been decided by the practice of the States, that it is better to leave a few of its noxious branches to their luxuriant growth, than, by pruning them away, to injure the vigor of those yielding the proper fruits." Works, Vol. 4, p. 544.

[23] There are dicta that may perhaps be to the contrary. See Near v. Minnesota, 283 U.S. 697, 716, 51 S.Ct. 625, 75 L.Ed. 1357; Chaplinsky v. New Hampshire, 315 U.S. 568, 571, 572, 62 S.Ct. 766, 86 L.Ed. 1031; Winters v. New York, 333 U.S. 507, 510, 68 S.Ct. 665.

[24] Hannegan v. Esquire, Inc., 327 U.S. 146, 156, 66 S.Ct. 456, 90 L.Ed. 586.

[25] Cf. Swearingen v. United States, 161 U.S. 446, 451, 16 S.Ct. 562, 40 L.Ed. 765.

[26] See United States v. One Book Entitled Ulysses, 2 Cir., 72 F.2d 705, 709; Parmelee v. United States, 72 App.D.C. 203, 113 F.2d 729.

[27] It might conceivably be argued that it would be a defense if what he wrote had evil effects but he thought his words wholly demure.

[28] See Judge L. Hand in United States v. Kennerley, D.C., 209 F. 119, 120; United States v. Levine, 2 Cir., 83 F.2d 156; Parmelee v. United States, 72 App. D.C. 203, 113 F.2d 729.

cisc.[29] Nor are there any Supreme Court decisions which clarify it.

3. Let us assume, however, that we have a standard sufficiently precise to render the statute constitutional if it be interpreted to mean that a book is obscene which will probably have socially undesirable effects on normal readers. Even so, it is arguable that with a statute which, at best, skirts unconstitutionality, the finding of fact that such will be the probable results must be supported by evidence of an unusually clear and convincing kind—in other words, it is arguable that the evidence ought to be of a far stronger character than is required as the basis of ordinary administrative action. But, in the case at bar, the sole evidence to support the finding consists of the book itself.

However, although the Supreme Court has never passed on this question, the lower courts have held that direct proof of such harmful effects is not necessary. Perhaps because the primitive state of our psychological knowledge makes convincing proof of any such effects almost unobtainable, the lower courts have, instead, taken the current mores, "the social sense of what is right," the "average conscience of the time," i. e., what at the time is the attitude of the community in general.[30] Maybe, then, the Postmaster General's finding will suffice, if based upon a not irrational determination of the contemporary public attitude towards books like this. But here he made no express finding about that attitude.

We thus do not know how he arrived at his conclusion as to obscenity. To sustain his order, we must, at a minimum, read into the record an implied administrative determination that the book is at odds with the "average conscience of the time." He has not told us how he ascertained that average conscience.[31] In effect, we are asked to infer that he invoked something like judicial notice. That, however, can mean no more than a guess as to public opinion. And the recent Presidential election teaches that such a guess, even when assisted by so-called public-opinion polls, may go badly astray.

Because the state of our knowledge of psychology and the inadequacy of our procedures for determining public opinion make this question less susceptible of expert, objective, and explainable administrative determination than most questions passed on by administrative bodies, and noting again how closely this suppression stat-

---

[29] George Bernard Shaw, testifying in 1909 before a Parliamentary committee, was asked whether he thought there "should be power of prosecution if incitements to sexual vice take place on the stage." He replied, "No, I could not admit that, because if you prosecute for incentives to sexual vice, you immediately make it possible to prosecute a manager because the principal actress has on a pretty hat or is a pretty woman. I strongly protest against anything that is not quite definite. You may make any law you like defining what is an incentive to sexual vice, but to lay down a general law of that kind with regard to unspecified incentives to sexual vice is going too far, when the mere fact of a woman washing her face and putting on decent clothes, or anything of the kind, may possibly cause somebody in the street who passes to admire her and to say, 'I have been incited to sexual vice.' These generalizations are too dangerous." Pearson, G.B. S. (1942) 255.

[30] See United States v. Kennerley, D.C. 1913, 209 F. 119, 121, a criminal obscenity case.

Judge L. Hand there said that a jury is especially equipped to determine the "social sense of what is right" at "any given time." He repeated that idea in United States v. Levine, 2 Cir., 1936, 83 F.2d 156, 157. I have my doubts. For any particular single jury may not at all represent the "average" views of the community, especially on such a subject.

Moreover, eleven years after deciding the Levine case, Judge Learned Hand, in Repouille v. United States, 2 Cir., 165 F.2d 152, 153, rejected a jury's verdict as a guide to the prevailing moral standards with respect to the "good moral character" of the very man there before the court. That case did not relate to obscenity, but, according to Judge Hand, the applicable test was "the generally accepted moral conventions current at the time."

[31] Perhaps his order, on that account, fails to comply with the Administrative Procedure Act, 5 U.S.C.A. § 1007(b); but I pass that point.

ute approaches unconstitutionality, I would think that a reviewing court should scrutinize with more than ordinary care such an administrative determination with respect to public opinion. Engaged in such scrutiny, the judges must fall back on their own judicial notice, must by that means decide whether the official's guess is rational enough to be supportable. But where will the judges gather the facts to inform their judicial notice? Those whose views most judges know best are other lawyers. It would seem not improper to take judicial notice that tales such as those the Postmaster General here found obscene are freely told at many gatherings of prominent lawyers in meetings of Bar Associations or of alumni of our leading law-schools.[32] I doubt whether we ought arrogantly, undemocratically, to conclude that lawyers are a race apart, or an intellectual elite (like Plato's totalitarian "guardians" or "guards"[33]) with a "sense of what is right" for themselves, which has no relation to what is right for the vast multitude of other Americans, whom (a la Plato) they may look upon as children.

The truth of the matter is that we do not know, with anything that approximates reliability, the "average" American public opinion on the subject of obscenity. Perhaps we never will have such knowledge. For many years we have heard talk of "social science," and some may believe that from that source we may obtain the needed enlightenment. But, if "science" connotes a fairly high degree of accuracy, most studies of society, although by no means useless for all purposes,[34] are further away from the "scientific" than were alchemy or astrology.[35] Maybe some day we will attain scientific data about community opinion. One wonders whether free speech and free press may validly be suppressed when their suppression turns on the dubious data now available.

4. I can think of no better way, in the present state of our ignorance, to decide the rationality of the finding that this book is obscene than to compare it with other books now accessible to all American readers. On that basis, I have considerable difficulty in believing the Postmaster General's finding correct. For anyone can obtain for the asking, from almost any public library, a copy of Balzac's Droll Stories, translated into English.[36] That easy accessibility of that book might well serve as a persuasive indicator of current public judgments about the type of acceptable— i. e., not obscene—writing. Within the past few days, I have re-read Droll Stories. For the life of me, I cannot see, nor understand how anyone else could see, anything in that book less obscene than in Waggish Tales which the Postmaster General has suppressed.

This court, per Judge A. N. Hand, has held that the passages alleged to be obscene in Joyce's Ulysses played a subordinate role.[37] The same cannot possibly be said of Droll Stories, which one deceased conservative critic described as "tales in which the lusts of the flesh are unleashed,

---

[32] One thinks of the lyrics sung at many such gatherings by a certain respected and conservative member of the faculty of a great law-school which considers itself the most distinguished and which is the Alma Mater of many judges sitting on upper courts.

To revert for a moment to the question of the socially dangerous effects of obscenity, it is relevant that no noticeably depraved behavior has been discovered among lawyers as a group.

[33] That the correct translation is "guards," see Fite, The Platonic Legend (1934) 14.

As to Plato's totalitarian, anti-democratic teachings, see, e.g., Fite, loc.cit., passim.

Let it not be forgotten that Plato would have banished all poets from his ideal state, and that in the Laws he advocated rigid censorship.

[34] Cf. Frank, Book Review, 15 Un. of Chi.L.Rev. (1947) 462; Frank, Fate and Freedom (1945) 40-41.

[35] Cf. Frank, A Plea for Lawyer-Schools, 56 Yale L.J. (1947) 1303, 1330-1342; Frank, Fate and Freedom (1945) passim.

[36] Apparently in 1930, a United States Customs ban on Droll Stories, theretofore existing, was lifted and never reimposed. See Haight, Banned Books (1935) 47.

[37] United States v. One Book Entitled Ulysses, 2 Cir., 72 F.2d 705, 708.

satisfied and left to run riot amid a bacchanalia of flushed Priapi." [38] Were that critic the Postmaster General, and were he to set up his own opinion of obscenity in disregard of the most readily available manifestations of American attitudes (i. e., public-library usages), he would suppress the Balzac book.

It will not do to differentiate Waggish Tales on the ground that Droll Stories is a "classic" which comported with the mores prevailing at the time and place of its publication. Balzac's own comments on this work show his awareness that it would, as it did, offend many of his contemporaries,[39] such as George Sand who called it indecent. More important, where we seek to discover the attitude prevailing in this country today, the question is not what those living in Balzac's day thought of that book but how the "average" American now regards it. Wherefore (perhaps because I am without experience or am overly obtuse), I do not understand just how the "average conscience of the time" [40] test of obscenity can be reconciled with the notion that a "classic"—defined as a work which has an "accepted place in the arts" —is not obscene,[41] no matter what its contents and regardless of whether it is in tune with that current "average conscience."

Nor will it do to say that Droll Stories possesses unusual artistry which I chance to think Waggish Tales lacks. For this argument cuts just the other way: If a book is dominantly obscene, the greater the art, the greater the harmful impact on its "average" reader. If superior artistry—or what my colleagues call "literary distinction"—were to confer immunity from official control, then someone would have to determine which books have that quality. The Postmaster General's function would then be that of literary critic, with the reviewing judges as super-critics. Jurisprudence would merge with aesthetics. Authors and publishers would consult the legal digests for legal-artistic precedents. We might some day have a legal Restatement of the Canons of Literary Taste. I cannot believe Congress had anything so grotesque in mind.

In sum, as Droll Stories appears obviously acceptable to the American public, and by that test is not obscene, no more, one would incline to think, is Waggish Tales.

6. I agree that the fraud orders concerning the circulars which advertise Self Defense For Women and Bumarap must stand, for the evidence—the circulars themselves—support the findings on which those orders are based.[42] But, as they rest on the ground that a person commits a fraud who advertises a book as if its dominant theme resembled that of Waggish Tales when in fact it does not, these orders tend to show that a considerable number of the reading public, and especially those who would buy and would probably read Waggish Tales,[43] want books like it. If so, then these orders strongly indicate that that book is not out of line with our present mores, and thus

---

[38] Quoted by Jacques Le Clercq, in translator's Preface to Heritage Press ed. (1932).

[39] In the foreword to the first ten tales, he wrote: "There are countless people in France attacked by that British cant Lord Byron so often complained of. These people, whose cheeks blush at a pithy frankness which once moved kings and princesses to laughter, have draped our hallowed physiognomy in mourning; they have persuaded the gayest, wittiest nation in the world to laugh decorously and underhand * * *".

[40] Judge L. Hand in United States v. Kennerley, D.C., 209 F. 120.

[41] Judge L. Hand in United States v. Levine, 2 Cir., 83 F.2d 156, 157.

Perhaps Judge Hand meant merely that the fact that a book is a "classic" is some evidence that it is attuned to the "average conscience." Then, however, the character of a classic—like Droll Stories or the Decameron—should represent the standard of non-obscenity by which other books (like Waggish Tales) are to be judged.

[42] Here, again, however, there may be a doubt as to compliance with the Administrative Procedure Act.

[43] It has been said that "what counts is its effect * * * upon all those whom it [a book] is likely to reach"; United States v. Levine, 2 Cir., 83 F.2d 156, 157.

those orders may well be inconsistent with the finding that Waggish Tales is obscene.

I repeat, however, that, since, as a novice, I am unwilling in this case to oppose my views to those of my more experienced colleagues, I concur in their decision, but with bewilderment.