DECEMBER 15, 1969

No. ——.   BYRNE, DISTRICT ATTORNEY OF SUFFOLK COUNTY *v.* KARALEXIS ET AL.   D. C. Mass.   Motion for stay of temporary injunction issued by United States District Court for the District of Massachusetts presented to MR. JUSTICE BRENNAN, and by him referred to the Court, granted pending timely filing and disposition of an appeal.   Should such an appeal not be filed,

this stay to expire automatically. Should such appeal be timely docketed, this stay to continue pending Court's action on jurisdictional aspect of the case. In the event appeal is dismissed or judgment below summarily affirmed, this stay to expire automatically. Should Court note probable jurisdiction of appeal or postpone further consideration of question of jurisdiction to hearing on the merits, this stay to remain in effect pending issuance of the judgment of this Court.

MR. JUSTICE DOUGLAS, dissenting.

Respondents are the owners and operators of a motion picture theatre which has been showing the film, "I Am Curious (Yellow)." On June 3, 1969, they were indicted by the Suffolk County, Mass., Grand Jury for possessing with intent to exhibit an obscene film in violation of Mass. Gen. Laws, c. 272, § 28A. On June 17, 1969, respondents brought an action in the United States District Court for the District of Massachusetts to enjoin future prosecutions for the showing of "I Am Curious (Yellow)" and to declare that prosecution and the Massachusetts statute unconstitutional. On June 24, 1969, the three-judge District Court enjoined the prosecution on the ground that the indictments did not allege *scienter*. The indictments were then dismissed, and new indictments were thereafter returned. Respondents' request for a temporary injunction barring the second prosecution was denied by the District Court on July 15, 1969. The court stated that it would not consider a claim that the film was not obscene as an evidentiary matter, but invited the parties to submit briefs on the question whether the Massachusetts statute was unconstitutional on its face.

Respondents were convicted of the state obscenity offense on November 12, 1969. The applicant in this proceeding, the District Attorney of Suffolk County,

has not agreed that respondents may exhibit the film pending the appeal of their convictions. On November 19, 1969, applicant moved the District Court to abstain from deciding the constitutionality of the Massachusetts statute, pending the resolution of that issue in the state courts. On November 28, 1969, the District Court, by a 2–1 vote, denied the motion and authorized a temporary injunction enjoining applicant from interfering with respondents as respects future showings of the film, "I Am Curious (Yellow)," pending a final disposition by the District Court on the merits.

Applicant now requests this Court to stay the temporary injunction that was issued by the District Court.

The injunction issued by the District Court does not interfere in any way with the criminal conviction already obtained in the Massachusetts courts. That case will proceed unaffected by anything the federal court does, save for final execution of the state judgment. *Dombrowski* v. *Pfister,* 380 U. S. 479, is different. There we did not force petitioners to risk vindication of their constitutional rights in a state prosecution under an "overly broad" state statute. *Id.,* at 486. But in this case that risk was faced and resolution of the constitutional issues is being undertaken in the state courts. All that the federal court proposes is protection of respondents against repeated prosecutions, while both the state courts and the federal courts are resolving the constitutional issues. Enjoining one state prosecution, though perhaps permissible under *Ex parte Young,* 209 U. S. 123, would not be in keeping with more recent decisions. *Douglas* v. *Jeannette,* 319 U. S. 157. But I read the sparse record before us differently from MR. JUSTICE STEWART and believe that we deal here with threats of repeated prosecutions; and those threats seem to me to be no less ominous to the federal constitutional regime than the threatened harassment of union

leaders in *Hague* v. *CIO*, 307 U. S. 496, who were asserting First Amendment rights in explaining the purposes of the new National Labor Relations Act. See the opinion of Mr. Justice Roberts, in which MR. JUSTICE BLACK concurred, *id.*, at 504–506.

There may in time be a collision between the two systems for us to resolve. Meanwhile I would let the two orderly processes go ahead. For I can imagine no better and smoother accommodation of the needs of the two regimes than that designed by the District Court.

Underlying the state case and the federal case is an important First Amendment question. Some people think that "obscenity" is not protected by the Free Speech and Free Press Clauses of the First Amendment. They believe that both Congress and the States can set up regimes of censorship to weed out "obscenity" from literature, movies, and other publications so as to rid the press of what they, the judges, deem to be beyond the pale.

I have consistently dissented from that course but not because, as frequently charged, I relish "obscenity." I have dissented before and now because I think the First Amendment bars all kinds of censorship. *Ginsberg* v. *New York*, 390 U. S. 629, 650 (DOUGLAS, J., dissenting); *Ginzburg* v. *United States*, 383 U. S. 463, 482 (DOUGLAS, J., dissenting); *Roth* v. *United States*, 354 U. S. 476, 508 (DOUGLAS, J., dissenting). To impose a regime of censors requires, in my view, a constitutional amendment. "Obscenity" is no exception. "Obscenity" certainly was not an established exception to free speech and free press when the Bill of Rights was adopted. See my concurring opinion in *Memoirs* v. *Massachusetts*, 383 U. S. 413, 428–433. It is a relatively new arrival on the American scene, propelled by dedicated zealots to cleanse all thought.

Prior to the Bill of Rights, state law, when it spoke of freedom of the press, meant only freedom from prior restraint. But an author or publisher could be held accountable for publishing what the statehouse thought was against "the public good." In other words, the First Amendment did not build on existing law; it broke with tradition, set a new standard, and exalted freedom of expression. There is no trace of a suggestion that "obscenity," however defined, was excepted.

That does not mean that "obscenity" is good or that it should be encouraged. It only means that we cannot be faithful to our constitutional mandate and allow any form or shadow of censorship over speech and press.*

When our rewards go to people for thinking alike, it is no surprise that we become frightened at those who take exception to the current consensus. Then the hue and cry goes up for censors; and that is the start of an ominous trend. What can be done to literature under the banner of "obscenity" can be done to other parts of the spectrum of ideas when party or majoritarian demands mount and propagandists start declaiming the law.

The "obscenity" issue raises large questions. To what extent may government watch over one's shoulder as he reads?

---

*John Hohenberg recently stated this First Amendment philosophy in a slightly different setting:

"As Aleksandr Solzhenitsyn wrote in bitter response to his removal from the rolls of the Russian Writers' Union late in 1969 following the West's sympathetic reception of two of his novels that he could not have published in his own country: 'It is time to remember that the first thing we belong to is humanity. And humanity is separated from the animal world by thought and speech, and they should naturally be free. If they are fettered, we go back to being animals. Publicity and openness, honest and complete—that is the prime condition for the health of every society, and ours too.'

"Wherever freedom is denied, these words will live on." 52 Saturday Review 72 (Dec. 13, 1969).

Judge Jerome Frank said in *Roth* v. *Goldman,* 172 F. 2d 788, 792:

"I think that no sane man thinks socially danger-
ous the arousing of normal sexual desires. Conse-
quently, if reading obscene books has merely that
consequence, Congress, it would seem, can consti-
tutionally no more suppress such books than it can
prevent the mailing of many other objects, such as
perfumes, for example, which notoriously produce
that result. But the constitutional power to sup-
press obscene publications might well exist if there
were ample reason to believe that reading them
conduces to socially harmful sexual conduct on the
part of normal human beings. . . . Macaulay, re-
plying to demands for suppression of obscene books,
said: 'We find it difficult to believe that in a world
so full of temptations as this, any gentleman, whose
life would have been virtuous if he had not read
Aristophanes and Juvenal, will be made vicious by
reading them.' Substitute 'Waggish Tales from the
Czech' for 'Aristophanes and Juvenal,' and those re-
marks become relevant here."

If "obscenity" can be carved out of the First Amend-
ment, what other like exceptions can be created? Is
"sacrilege" also beyond the pale? Are utterances or
publications made with "malice" unprotected? How
about "seditious" speech or articles? False, scandalous,
and malicious writings or utterances against the Congress
or the President "with intent to defame" or to bring them
"into contempt or disrepute" or to "excite" against them
"the hatred of the good people" or "to stir up sedition,"
or to "excite" people to "resist, oppose, or defeat" any
law were once made a crime. (1 Stat. 596–597.) Now
that the First Amendment applies to the States, *Strom-
berg* v. *California,* 283 U. S. 359; *Near* v. *Minnesota,*
283 U. S. 697, may the States embark on such totalitarian

controls over thought or over the press? May Congress do so?

We forget today that under our constitutional system neither Congress nor the States have any power to pass on the value, the propriety, the Americanism, the soundness of any idea or expression. It is that insulation from party or majoritarian control provided by the First Amendment—not our gross national product or mass production or pesticides or space ships or nuclear arsenal—that distinguishes our society from the other planetary regimes.

### Opinion of MR. JUSTICE BLACK.

I agree completely with MR. JUSTICE DOUGLAS that state criminal punishment of these respondents for showing an allegedly "obscene" film is absolutely prohibited by the First and Fourteenth Amendments. That, however, does not end for me the constitutional problems involved. In this case a Federal District Court stepped into the middle of a pending state criminal prosecution, rendered an opinion in effect deciding the fundamental constitutional issue in the state case, and enjoined the initiation of new prosecutions of these defendants or the execution of any sentence imposed on them in the pending state case. One of the fundamental aspects of our federal constitutional system requires that federal courts refrain from interfering in pending state criminal prosecutions except in highly unusual and very limited circumstances. I do not think the facts of this case present an occasion for departure from that general rule. It is for that reason alone that I agree with the Court's decision to stay the injunction issued by the Federal District Court against the District Attorney of Suffolk County.

### Opinion of MR. JUSTICE STEWART.

Without reaching the First and Fourteenth Amendment issues discussed by MR. JUSTICE BLACK and MR.

JUSTICE DOUGLAS, I join the Court's decision to stay the injunction for the reason indicated by MR. JUSTICE BLACK—*i. e.*, the general rule that "requires that federal courts refrain from interfering in pending state criminal prosecutions . . . ." This case does not now present the "highly unusual and very limited circumstances" that would justify a departure from that rule—such as would be presented by the threat or actuality of repetitive prosecutions for exhibition of the film in question.