Arthur H. Goldberg, P. J.
A play entitled£ £ Che, ’ ’ written by defendant Lennox Raphael and produced by defendant Edward Wode, opened at the Free Store Theatre, on Cooper Square, in Manhattan, on March 22,1969. Two days later, after a complaint had been executed by a deputy police inspector, a Judge of the Criminal Court viewed the play and issued warrants for the arrests of defendants Raphael and Wode and the six other defendants, five of whom were the performing actors, the sixth being the set designer and lighting operator.
All the defendants — they were arrested on March 24 — were charged with the crimes, under the Penal Law, of obscenity (§ 235.05, subd. 2), public lewdness (§ 245.00), consensual sodomy (§ 130.38), and conspiracy in the fourth degree to engage in such conduct (§ 105.00).
The complaint was thereafter superseded by a Grand Jury information containing 54 counts which charge these crimes and specify acts of misconduct during performances of the play on March 20 (a preview), 24 and 26 and on April 26, 1969. The play continued to be shown at the same theatre, with a brief interruption shortly after the arrests.
The length and complexity of the trial were unavoidable. Specific physical activity comprising four separate performances was proved by the prosecution. This was shown (a) by the testimony of a deputy inspector of the Police Department who had attended all four performances (the observations were keyed into or related to the written script by the witness); (b) by the playing of a sound tape recording of the play; (c) by TV tapes — sound and visual — of about 25-minute portions of the performance of March 26 made by technicians of the National Broadcasting Company and ¡the Columbia Broadcasting System who were invited by the producer to attend that performance, given two days after the arrests; (d) by a number of still photographs taken during the press performance of March 26; (e) by the opinion ¡testimony of a well-known Broadway theatrical producer who testified that the play was in his opinion obscene and without redeeming social value.
Charging pandering, the prosecution showed that a newspaper advertisement was placed by the defendants, containing a quite large photograph of a nude woman lying on a nude man, annotated with a gamy caption; also a lengthy newspaper interview given by the defendant Raphael which reveals that a prurient interest in sex was dominant in the theme and intent of the play.
*976 The interview and advertisement and, we add, the insistent and pervasive sex talk and vile profanity and utter filth which permeated the play, are not quoted in this opinion but they are quoted in the trial testimony and also appear as exhibits, which include the scripts and tape recordings.
On the pandering contention, the prosecution also produced a witness who testified without contradiction that defendant Georgiou on opening night alighted from a limousine in front of the theatre and then walked across the sidewalk into the theatre dressed in the costume which he wore during the entire performance — an Uncle Sam hat, a sash around his waist with a streamer down the side of one leg, and 10 painted toenails, nothing else.
Defendant Raphael testified about the content and intent of the play (sex and politics he called it). A number of theatre critics and playwrights testified on behalf of the defendants. Their testimony for the most part amounted to assertions that any play has redeeming social value and that virtually no conduct on stage by actors during the performance of a play should be considered a violation of the obscenity laws. In effect these opinions amounted to a call for a repeal, or nonenforcement, of the obscenity laws. The witnesses were quite uniformly of the opinion that nudity and sexual activity have become the vogue on the so-called “ off-off-Broadway, ’ ’[1] stage. This new vogue they estimated as being about one year old at the time of the trial (Jan., 1970). This new freedom was such, one witness said, that the “ off-off-Broadway ” audiences would accept just about any kind of sexual activity on stage.
We turn to the charges in the order in which they appear in the information. First is the charge of obscenity, which underlies all the counts in the information.
With some frequency and for some years the opinion has been expressed in the press that the obscenity laws should be repealed, as they have been in Denmark, and that, if that were done, obscene performances and other material would come to be regarded as boring and would die out. Opinions to the contrary are not lacldng. Quite evidently our State Legislature hasj adopted the view that the obscenity laws should be continued and enforced. In enacting article 235 of the Penal Law, the Legislature made the obscenity laws less permissive (see commentary to Penal Law, § 235.00 by Denzer and McQuillan, *977 McKinney’s Cons. Laws of New York, Book 39, Penal Law, p. 89). Section 235.05 was amended as to form in 1969, but the section was continued in full force and effect by the Legislature (L. 1969, ch. 583, § 2).
Given this clear and continuing mandate by the Legislature, this court must decide whether the play “ Che ” as performed on March 24, 1969 was obscene under the Penal Law (§ 235.05, subd. 2) or whether the performance was protected by the First and Fourteenth Amendments.
The Penal Law definition of “ obscenity ” (§ 235.00) closely parallels the United States Supreme Court’s definitions of obscenity (cf. Redrup v. New York, 386 U. S. 767, 770-771 [1967] ; Memoirs [Fanny Hill] v. Massachusetts, 383 U. S. 413, 418 [1966]). Section 235.00 reads in part as follows: “ 1. ‘ Obscene, ’ Any material or performance is ‘ obscene ’ if (a) considered as a whole, its predominant interest is to prurient, shameful or morbid interest in nudity, sex, excretion, sadism or masochism, and (b) it goes substantially beyond customary limits of candor in describing or representing such matters, and (c) it is utterly without redeeming social value.”
The main problem, it has been often said, is one of determining just what is obscene, a problem which is said to persist unrelieved by the statutory definition. Mr. Justice Stewart has said that he finds it difficult to define hard-core pornography in words, but, he said, “ I know it when I see it ” (concurring in Jacobellis v. Ohio, 378 U. S. 184, 197 [1964]). In another opinion, he said that hard-core pornography would include pictorial depiction of acts of sexual intercourse or sodomy (Stewart, J., dissenting in Ginzburg v. United States, 383 U. S. 463, 499 [1966]). The California Supreme Court in In re Panchot (70 Cal. 2d 105 [1968]) indicates a similar line of distinction in holding that still photographs were not obscene though showing nudes in poses emphasizing various parts of the body, because the pictures did not depict any form of sexual activity. Citing Landau v. Fording (388 U. S. 456, infra); Mishkin v. New York (383 U. S. 502), and Ginzburg v. United States (383 U. S. 463, supra), the California court said (In re Panchot, supra, p. 107, n. 5): “ Graphic depiction of sexual activity is the distinguishing feature of the only materials which the United States Supreme Court has ruled to be obscene. ’ ’
In People v. G. I. Distrs. (20 N Y 2d 104, 106-107 [1967]), Judge Breitel found that the pictorial portrayal, in a pamphlet, of a “ full range of sexual behavior between young males from byplay to pederasty ” transgressed section 1141 of the old Penal Law.
*978 Such decisions by our highest courts do indicate palpable lines between obscenity and protected expression. The difficulty in delineating the obscene is nevertheless said to be a continuing one and that the attempt ¡to draw a line should, therefore, simply be abandoned.
Justice Holmes would have disagreed. In a letter to Sir Frederick Pollock he said of such reasoning (2 Holmes-Pollock Letters [2d ed.], 28) that it “ reminds me of how people in the law as elsewhere hate to recognize that most questions — I think I might say all legal questions — are questions of degree. I have just sent back an opinion of one of our JJ. with a criticism of an argument in it of the ‘ where are you going to draw the line ’ type — as if all decisions were not a series of points tending to fix a point in a line. ’ ’
We believe that the play “ Che ” indicates lines which can be drawn. Many kinds of sexual activity, most of it by nude actors, were shown during the performances covered by the information. One of the performers, already described, was nude throughout the performance, except for a hat and ribbon around his waist. One female defendant was completely nude during a good part of the performance. During one scene, she wore the lower part of a tiny bikini which kept slipping. The male who played the title role disrobed during the play and appeared in the nude for a substantial part of the second half. The other female defendant did not disrobe but participated in sexual contact activity with the nude performers.
The prosecution established that the many sexual acts were simulated closely indeed. In at least two of these sexual encounters there was actual penetration according to eyewitness testimony which was not contradicted.
These sexual activities on stage ran the gamut. Twenty-three different sex acts were presented in “ Che,” according to the testimony and exhibits in the record. These acts are described in summary fashion in the several counts of the information. They include simulated heterosexual copulation by nude performers, masturbation, and three kinds of sodomy (male homosexual, heterosexual, and even an attempted male self-sodomy). There was a simulated defecation scene performed by a nude male, complete with the use of toilet tissue at one performance. At other performances, the material used was a piece of cloth showing a ‘ ‘ field of stars. ’ ’ At some performances, a flowerpot was used in this scene, superseded at other performances by a standard toilet.
No claim was made that this last-described scene had any particular redeeming political or social significance. On the *979 other hand, the sex scenes were said by several of defendants ’ witnesses to be rich in political metaphor. The penis, to take one alleged metaphor, was said to represent power, though no particular power is described at any point in the play.
That the simulation in the sex scenes was close to reality was not by chance. A reporter of CBS Television testified that the defendant Raphael who wrote the play told him, at a press showing of “ Che,” that the actors had been told they were at liberty to perform any sex act on stage at any time, if they felt spontaneously that actual sex would enhance the realism of their performance.
We are of the opinion ¡that the performance of “Che” transgressed even the hard-core pornography standards of the more permissive obscenity laws of New York in effect prior to 1967. The earlier statute was interpreted in People v. Richmond County News (9 N Y 2d 578, 582 [1961]) as including “only those prohibitions which find the widest acceptance and which reflect the most universal moral sensibilities.” In that opinion Judge Ftjld, now Chief Judge of the State of New York, gave us two additional broad guidelines. He added, in Richmond County News (9 N Y 2d 581): “ The law’, said Judge Cardozo, ‘ will not hold the crowd to the morality of saints and seers ’ (Paradoxes of Legal Science, p. 37); nor, we would add, will it hold the crowd to the literary or artistic fashion of the hour.” (Emphasis supplied.)
Judge Ftjld’s observation bears directly upon a chief contention made by the defendants, the argument that “ Che ” is acceptable theatre because it was produced during a sudden flowering, in the past year, of a new sexual freedom on “ ofif-offBroadway.” But it cannot be said that standards of public acceptance and morality so sharply different and shocking can be established by a few commercially inspired producers who try to see how far they can go.
This “ experimental theatre,” ostensibly for the younger play-g’oers who cannot afford Broadway prices, charged up to $10 per person for admission to “ Che.” This “ off-off-Broadway ” production was advertised daily in every leading New York City newspaper, including the “ New York Times.” It was not private or semiprivate club theatre.
Civil libertarians fought in the courts for years for the right to publish such books as Joyce’s Ulysses and Lady Chatterley’s Lover. The play “ Che ” is in quite a different area of sex, a new plateau, or, more accurately, a nadir of smut on the stage. One of the distinguished lawyers who has fought against censorship is Morris L. Ernst who represented the publisher in *980 United States v. One Book Entitled Ulysses (72 F. 2d 705, affg. 5 F. Supp. 182 [1934]). Just seven weeks ago, Mr. Ernst publicly stated that he deeply resents the present displays of tawdriness and pandering. Recalling his defense of “''Ulysses ” he said in part (New York Times, Jan 5, 1970): “ Whereas I defended the book and leigitimatized a four-letter word, that doesn’t mean that the four-letter word, out of context, should be spread and used — or sodomy on the stage or masturbation in the public arena here and the world over. ’ ’
Dr. Benjamin Spock also spoke out last month against the new obscenity. In a national magazine, he opened his discussion in this way (Redbook magazine[2], Jan., 1970, p. 20): “ For decades, I was an uncompromising civil libertarian and scorned the hypocrisy usually involved in the enforcement of obscenity laws. ’ ’
But recent trends, Dr. Spock says, have made him change his position. Agreeing that plays and movies should be able to deal ‘ ‘ with themes that involve sexuality and immorality ’ ’ Dr. Spock would distinguish those “ in which a primary aim ” (Redbook magazine, supra, p. 22) “is to shock, revolt or embarrass by explicitly depicting sexual intimacies — especially those of a loveless, perverse or brutal kind — and also acts of nonsexual brutality.”
D. H. Lawrence, who fought for the right of the artist to deal with sex themes, understood that pornography was another matter. He wrote, in language in part quoted in Richmond County News (9 N Y 2d, p. 587): “ But even I would censor pornography, rigorously * * * Pornography is the attempt to insult sex, to do dirt on it.” (The Portable D. H. Lawrence, Viking Portable Library, p. 653.)
“ Che ” does just exactly what Lawrence described and does it rather indiscriminately; it does it to sex both heterosexual and homosexual. It even drags in the bathroom.
A criminally obscene performance is not necessarily one that is erotic or lustful. If it were a matter of the erotic or lustful then Mr. Justice Douglas would be correct in saying,[3] so is perfume, and, we cannot condemn awy performance, he says, any *981 more than we can condemn a perfume. But Justice Douglas is not correct. We believe that the real question is, as D. H. Lawrence, Dr. Spock and Mr. Ernst have put it: Is the material sordid, shocking and debasing of sex?
We have concluded that two of the three statutory elements of the crime of obscenity — the appeal to prurience and the transgression of customary limits of candor in the representation of “ nudity, sex [and] excretion ” (Penal Law, § 235.00) — are overwhelmingly established by this record.
With these two elements a third must coalesce before First Amendment protection will be denied: the material complained of must be “utterly without redeeming social value” (Penal Law, § 235.00), the so-called value test. The first indication of such a test was given in Mr. Justice Brennan’s opinion in Roth v. United States, 354 U. S. 476 [1957], which dealt — we would emphasize — with books and circulars, and more recently this element of obscenity was stressed in Memoirs, 383 U. S. 413, supra, [1966]) which also dealt with written material, the novel “Fanny Hill.”
In “ Che ” we are not dealing with a book but with the performance of a play on the living stage. The protection of the First and Fourteenth Amendments — and, by implication, of article 235 of our Penal Law — of course extends to motion pictures, plays and other media just as they protect books and magazines. But whether the standards of prurience, expession and redeeming social value are to be applied in the same measure to live performances, or movies or network television as they are to books or other written material has not yet been the subject of a published opinion by the United States Supreme Court. The Supreme Court did affirm, without opinion, by a 5-4 vote, the decision of a California appellate court, that each method of expression 1 ‘ 1 tends to present its own peculiar problems ’ ” and that “ a motion picture of sexual scenes may transcend the bounds of the constitutional guarantee long before a frank description of the same scenes in the printed word” (Landau v. Fording, 245 Cal. App. 2d 820, 827, affd. 388 U. S. 456, supra, [1967]). The movie in Landau was held obscene because it dealt with sexual acts which are 1 ‘ graphically pictured or emphatically suggested with nothing omitted except those sexual consummations which are plainly suggested but meaningfully omitted” (245 Cal. App. 2d 828-829, supra; emphasis- supplied).
Both the California decision and, of course, the Supreme Court’s affirmance in Landau came shortly after the decision in Fanny Hill (383 U. S. 413, supra, [1966]).
*982 What may be found in the novel to be “ redeeming social value ” may not at all suffice to protect a live performance containing prurient and patently offensive material. ‘ ‘ Fanny Hill,” the novel, contains explicit descriptions of numerous scenes of heterosexual intercourse, homosexual acts, voyeurism, sadism and masochism. The novel was held to contain matter of ' ‘ redeeming social value ’ ’. However, it would seem quite clear that the presentation of Fanny Hill’s explicit scenes in a live play or motion picture or on TV would not be saved by the inclusion of the socially valuable material in that novel.
This difference in the impact of the several media on readers and audiences, and the question whether the redeeming social value test can or should operate in all situations and for all forms of expression in the same way is the subject of an excellent analysis by Charles Bembar, counsel for the successful defendant publisher in Fanny Hill (supra) (Rembar, The End of Obscenity [Bantam ed.], pp. 436-439, 482). Bembar explores the media gap between a novel like ‘ ‘ Fanny Hill ’ ’ and an explicit stage or movie enactment of the book. The conclusion he draws — that the redeeming social value test for written material may not be applied in the same way to a movie or to a live performance — is, we believe, correct. We are of the opinion that the value test must be applied in a different measure to the play “ Che ” than it would be ¡to a novel.
One of the witnesses for the defendants, a distinguished critic of ballet and drama, was asked whether a play containing, as its dominant theme, political ideas of substance and also containing integrated sex acts necessary to the logical or artistic development of the dominant theme, could be regarded as having a redeeming social value. ■ He said that such a play might be said to have “ social value ” but that it could not be said to have “ redeeming social value ” and that such a play should not be performed.
This witness drew a distinction between simulated and actual sex on stage and felt that “Che” fell into the simulated category and was therefore not obscene. We do not share that view. Ñor did the California court -draw any such distinction in Landau v. Fording (245 Cal. App. 2d 820, affd. 388 U. S. 456, supra). We note that this witness had seen only a special showing for critics, a performance given after the arrests had been made.
This question of a differentiation between books and movies (or plays) was discussed but was not decisive in United States v. A Motion Picture Film Entitled “ I Am Curious-Yellow ” *983 (404 F. 2d 196 [C. A. 2d, 1968]). There was recognition in one of the prevailing opinions that there might be a difference in the application of obscenity standards as between a book and a movie. We viewed that film at the request of the defendants and note simply that, unlike “ Che,” the film “ I Am Curious ” contains fully clothed people for most of its duration.
Quite different from “I Am Curious” is “Che.” In the film the social content was dominant, the sex minimal. In ‘1 Che ’5 the sex was pervasive but the politics were elusive.
“ I Am Curious ” is still sub judice in Massachusetts and in the United States Supreme Court (Byrne v. Karalexis, 396 U. S. 976, supra). See, also, United States v. A Motion Picture Film Entitled “ Pattern of Evil,” (304 F. Supp. 197 [So. Dist., 1969]) in which Judge Pollack commented that the sex-related scenes in “ I Am Curious ” comprised only “ a minor fraction of the film ” (304 F. Supp. 202). He also rejected the argument that it is proper to compare motion pictures with books, saying, ‘ ‘ it has not as yet been held that such a comparison concludes the question ” (304 F. Supp. 202).
The evidence of pandering in the exploitation of the play “ Che ” bears upon the question of redeeming social value as well as upon the elements of prurience and the patent offensiveness of the play. In Ginzburg v. United States (383 U. S. 463, supra), involving printed material and decided simultaneously with Memoirs, (Fanny Hill) (383 U. S. 413, supra) it was held (Mr. Justice Brennan, p. 470): “And the circumstances of presentation and dissemination of material are equally relevant to determining whether social importance claimed for material in the courtroom was in the circumstances, pretense or reality ”.
In Landau (245 Cal. App. 2d 820, supra) pandering was held to be directly relevant to the issue of redeeming social value, citing Ginzburg (supra). The pandering in “ Che ” was, as we have already noted, excessively preoccupied with the so-called sexual metaphors. The allegedly redeeming political content, elusive in the play, was just as elusive in the materials used for exploiting the play commercially.
As for the play itself, although some of the defendant’s witnesses said they found political content, one of them frankly stated that he did not perceive any until more than six months after viewing the play.
The elusiveness of the political content, if any, prevails despite the guidance of a day-long exposition on the witness- stand by the author himself. More readily perceptible to the court was the testimony, already noted, that the stage directions permitted *984 actual sex on stage. There was no comparable testimony as to any stage direction that the political content was to be given any particular emphasis.
As did Justice Brennan in Ginzburg (supra) we may inquire whether this political content was “ pretense or reality”, whether it was ‘ ‘ the basis upon which it was traded in the marketplace or a spurious claim for litigation purposes ” (Ginzburg, 383 U. S. 470, supra).
We have concluded that “ Che ” was without redeeming social value, and that as to the first count in the information, charging all the defendants with the crime of obscenity (Penal Law, § 235.05, subd. 2), the defendants are guilty.
There were other arguments presented during the trial and in summation:
(a) The “ whole book ” rule is said to militate against a finding of obscenity on this record. As noted, the prosecution introduced in evidence a recording of the sound of an entire performance, eyewitness testimony of the activities on stage, two television sound films of fairly extensive portions of the performance of March 26, 1969, four scripts, and still photographs of many scenes.
(b) It is argued that the prosecutor failed to establish “scienter” (cf. People v. Finkelstein, 9 N Y 2d 342 [1961]). But the production and performance of this live play by all the defendants would appear to leave little of that argument.
(c) Defendants argue that “ Che ” was in effect a “ private showing” and therefore, within the protection of Stanley v. Georgia (394 U. S. 557, [1969]); but the advertising and the pandering compel the conclusion that the production of “ Che ” was a public, commercial enterprise. Accordingly, we do not reach the question which was considered by the Federal District Court in Byrne v. Karalexis (supra).
The crime of public lewdness (Penal Law, § 245.00) is charged against all the defendants in each of the counts “ second ” to “ forty-fifth ” inclusive in the information. We find guilty the defendants who are described by name in each of those counts, except as to defendant Kornhauser as to count number 6, the charge in that count having been dismissed as to him on motion of the District Attorney. As to the defendants who are described in those counts collectively only, we find those defendants not guilty.
As to the third and fourth crimes charged — consensual sodomy and conspiracy (Penal Law, §§ 130.38, 105.00) —we find that the People have not established guilt beyond a reason *985 able doubt and accordingly find the defendants not guilty as to those two charges.
We note finally that the prosecution did produce considerable eyewitness testimony in an effort to establish the charges of consensual sodomy, as described in counts 46, 47, 48, 49, 50, 51, 52.. and 53. However, we find that the proof of pentration was not sufficient to establish guilt beyond a reasonable doubt as to these sodomy charges. If these acts had been charged as acts of public lewdness, a different finding of guilt would have been made.

. Defendants’ opinion witnesses described three classes of live theatre in New York: the traditional Broadway stage for tourists and benefit parties; a so-called “ off-Broadway ” stage where productions are less costly; the “ off-off-Broadway ” stage which is said to be more experimental.

. The Redbook article is a first installment of Dr. Spock’s new book, “ Decent and Indecent,” published Jan., 1970, by the McCall Publishing Company.

. Dissenting opinion in Byrne v. Karalexis, 396 U. S. 976, 977, an application by a county district attorney of Massachusetts for a stay pending his appeal from a. temporary injunction against further proceedings in the State courts following a conviction of obscenity for the showing of the film, “ I Am Curious (Yellow) ”. The stay was granted by a vote of 7-1 on December 15, 1969.