Albert Orenstein, J.
Defendant appeals from a judgment entered after trial by jury in the City Court of the City of Syracuse. He was found guilty of the crime of obscenity, in violation of subdivision 1 of section 235.05 of the Penal Law, and was sentenced on August 24, 1973, to pay a fine in the sum of $26,878. The charge herein stemmed from exhibition of the film, Deep Throat, in a. local theatre.
Defendant first objects to the procedure by which a copy of the film was obtained for use in the prosecution of this case, claiming that his Fourth and Fifth Amendment rights were thereby violated.
In effect, the film was acquired by way of an order to show cause, which restrained defendant from removing the film from this jurisdiction pending the outcome of an adversary hearing. The film was eventually produced pursuant to stipulation, but that agreement was coerced by contempt proceedings and does not affect the constitutional issues raised by appellant.
*1034 The question thus becomes one as to whether a defendant may be compelled to preserve evidence against himself for seizure at some future time.
With regard to the legality of employing an ex parte restraining order as a means of preserving evidence, the following dicta in Bethview Amusement Corp. v Cahn (416 F2d 410, 412) is relevant: "Finally it is suggested that unless the police or other local authorities have actual possession of the film pending the required adversary proceeding, the distributor may take advantage of the delay, for example, by shipping the film out of the jurisdiction or by cutting out the offending scenes. If there is a real threat of such activity it can be controlled by an ex parte restraining order.”
While the Bethview holding has since been rejected insofar as it required an adversary proceeding, nevertheless the court’s approval of an ex parte restraining order remains valid.
In this case the District Attorney’s office, acting prior to the definitive ruling in People v Heller (29 NY2d 319, affd sub nom. Heller v New York, 413 US 483) sought to afford defendant the added protection of an adversary hearing. In so doing, the guidelines set forth in Bethview (supra) were followed, including use of the suggested restraining device, which was incorporated into an order to show cause. It is significant that the same procedures were employed in issuing the show cause order as would be followed in connection with a search warrant. That is, the order was signed only after judicial inquiry into probable cause to find the film obscene. (See Lee Art Theatre v Virginia, 392 US 636.) A police investigator who had viewed the film submitted an affidavit which set forth, in vivid detail, the aspects of the film upon which he based his opinion that it was obscene. A reading of that affidavit, leaves no doubt that it allowed the court to focus searchingly on the question of obscenity.
For the above reasons, this court finds that the defendant should have obeyed the restraining portion of the order to show cause, which would have led to proper seizure of the film by search warrant. Therefore, defendant’s Fourth Amendment objections are not well founded.
In determining the applicability of defendant’s Fifth Amendment privilege against self incrimination it is necessary, under the authority of Schmerber v California (384 US 757), to examine the nature of the evidence involved. The *1035 Supreme Court held in Schmerber (supra, p 761) that: "the privilege protects an accused only from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature”. And: "that compulsion which makes a suspect or accused the source of 'real or physical evidence’ does not violate it” (p 764).
In this case the defendant was compelled to make available a film, which must surely be construed as "real or physical evidence” rather than as "evidence of a testimonial or communicative nature.” The very cases cited by defendant in support of his argument point up the distinction. Albertson v SCAB (382 US 70), Leary v United States (395 US 6), and Marchetti v United States (390 US 39), as well as a long line of cases stemming from firearm registration laws, all involve forms to be filled out or questionnaires to be answered by an individual. Clearly those cases, unlike appellant’s, dealt with acts of a communicative nature, which effectuated an admission of criminal activity in some form.
Considering, then, that the defendant herein was not compelled to produce, but was merely restrained from removing evidence, and considering also that the evidence involved was a publicly circulated film rather than private documents or papers, it cannot fairly be said that defendant’s Fifth Amendment rights were thereby violated.
Having found defendant’s Fourth and Fifth Amendment objections to be without sufficient merit, this court holds that the film, Deep Throat, was properly admitted into evidence.
Appellant next contends that the court below committed reversible error in its charge regarding the community standard aspect of the obscenity issue in this case.
The People first point out that defendant failed to register an objection or exception to the charge as given, and claim that he thereby waived an appeal of the issue. It is contended that if this were not so, a defendant could stand mute and purposely create issues to gain reversal on appeal.
It is clear in this particular case, however, that the defense did not stand mute by design, but rather because case law had not yet evolved sufficiently to support its present position. Furthermore, CPL 470.15 authorizes an appellate court to consider questions not duly protested at trial, with a view toward reversal in the interest of justice. (See, also, People v Robinson, 36 NY2d 224, 228.) This court will, therefore, proceed to consider the merits of defendant’s claim that the jury *1036 below was not properly instructed, especially with reference to the community standard by which the film, Deep Throat, was to be judged.
The New York Court of Appeals, in People v Heller (33 NY2d 314), held that a contemporary State-wide community standard must be the measure of a given film, and thereafter the Appellate Division, Fourth Department, decreed in People v Nitke (45 AD2d 543, 545) that the standard be given retroactive effect, to the extent that "when the appellate process has not been exhausted, the appellate court is generally required to apply the law as it exists at the time of appeal.”
In the present case the jury was instructed: "To establish the customary limits of candor, you must rely upon the contemporary community standards as you, the jury, sitting as the trier of fact decides those standards to be to the average person in the community.”
By using the term "community standards” without stating whether "community” meant the City of Syracuse, County of Onondaga or State of New York, the court allowed the jury to define the term in accordance with its connotation as a local as opposed to State-wide area. Therefore, the charge herein, to quote the Fourth Department in People v Nitke (supra, p 546): "cultivated the provincial prejudice which the Court of Appeals sought to eradicate by directing that State community standards apply (People v Heller, 33 NY2d 314, 322, supra).”
The court did go on to mention that the members of the jury were "simultaneously citizens of Onondaga County and the State of New York and the United States,” but only so as to admonish them to avoid personal opinions or prejudices. The Heller opinion, however, decried not only personal prejudice, but also all that is "local or provincial”. (See People v Heller, 33 NY2d, at p 322, supra.)
In any case, the mere mention of State-wide citizenship would not be sufficient compliance with recent case law development. That is, the Court of Appeals, in its second Heller decision, stated that the applicable community standard in New York has been, and will continue to be, defined and administered by our appellate courts as a matter of State law. (See People v Heller, 33 NY2d, at pp 326-327, supra.) Apparently, then, it is incumbent on a Trial Judge to fully explain and define that standard in his charge, as a matter of law. This was not done in appellant’s case, wherein the entire matter was specifically left up to the jury as the trier of fact.
*1037 Furthermore, even assuming the jury was properly instructed to determine the issue as a matter of fact, the trial transcript herein indicates that the People offered no evidence whatsoever as to the current standard in any community, nor the extent, if any, to which the film exceeded a given standard. (It is noted that the Supreme Court, in Miller v California [413 US 15, 31], did assume that the applicable community standard was a factual issue, and mention is made in that case of evidence offered by the State’s "expert on community standards”.) Because there was neither a legal definition nor a factual showing as to the applicable community standard, the jury in this case was understandably confused, and that confusion became apparent when, during deliberations, they returned to ask the court the following with reference to the concept of "community candor”: "Does it in any way imply a percentage of the — an assumption on our part relative to the —an assumption of the population, whether they would feel the movie was, in fact, obscene or not?”
In response, the court merely told the jury that this was a question for them to decide. At that point the jury deliberations became fatally infected, because there was no criteria, in the form of fact or law, by which the jury could possibly have resolved its confusion concerning the concept of "community standard”.
One can sympathize with a Judge who must define our contemporary State-wide community standard. It is an elusive concept, and has not been clearly dealt with in decisions to date. Apparently, the standard is equated with the term "hard core pornography” (see People v Heller, 33 NY2d, at p 334, supra), but one could argue that the latter term is more a synonym for "obscenity” than a standard by which obscenity may be measured.
It is hoped that the Legislature and the courts will eventually evolve a less ponderous solution to the problem of obscenity. Not only is it difficult to deal logically with article 235 of the Penal Law, but prosecution under that statute is costly, erratic, and largely ineffective. Furthermore, a serious question persists as to whether the conviction of individuals for promoting material not yet judged obscene is an unconstitutional imposition of criminal liability. (See Paris Adult Theatre I v Slaton, 413 US 49, 86-88 [Justice Brennan, dissenting]; Miller v California, 413 US 15, 41-44, supra *1038 [Justice Douglas, dissenting]; People v Heller, 33 NY2d 314, 339-341, supra [Wachtler, J., dissenting].)
Civil procedures already exist whereby the material, rather than the man, may be judged in an adversary proceeding and removed from circulation by injunction. (See CPLR 6330.) Perhaps this smacks too much of censorship, but article 235 of the Penal Law merely requires theatre and bookstore owners to censor for the public, out of fear of prosecution. Moreover, the standards they must employ to avoid a "close case” are broader than necessary, and the cause of free expression will suffer proportionately.
The defendant herein must, of course, stand trial under the existing law, but he is entitled to every protection that the law offers. In this case that now includes the right to be judged by a jury properly instructed as to the element of a contemporary State-wide community standard.
To that end, the judgment of conviction should be reversed in the interest of justice and the case remitted to City Court for a new trial on the charge herein.
It should be noted that there also exists an independent basis for vacating the sentence imposed by the court below. Our Court of Appeals, in People v Mature Enterprises (35 NY2d 520), held that a defendant may be fined only in accordance with the gain realized from promotion of material on the specific dates charged. Instead, although the defendant in this case was charged with violation of section 235.05 of the Penal Law only on January 18, 1973, he was fined an amount representing twice the gain realized for the total length of time that the movie was shown. The People agree that the sentence imposed was thus excessive under the mandate of Mature Enterprises (supra).
It is also noted that the fine imposed upon the defendant in his individual capacity was erroneously computed upon evidence as to the gain which accrued to the corporate owner of the theatre involved. Although the People could have prosecuted the corporate owner, as was done in the Mature case, they chose to charge defendant as an individual responsible for corporate conduct, pursuant to section 20.25 of the Penal Law. Having done so, they should have confined their proof, with regard to sentencing under subdivision 5 of section 80.05 of the Penal Law, to evidence of defendant’s personal gain from exhibition of the film on the dates charged. If such evidence was not available, then the court should not have *1039 imposed the alternate sentence set forth in subdivision 5 of section 80.05.
Judgment is reversed and a new trial granted.