THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v LOUIS CIAMPA, Appellant.—Appeal by defendant from a judgment of the Supreme Court, Queens County, rendered January 30, 1976, convicting him of obscenity in the second degree, upon a jury verdict, and imposing sentence. The appeal brings up for review the denial, after a hearing, of defendant's motion to suppress certain statements. Judgment affirmed. On November 1, 1974 defendant-appellant was arrested in the lobby of the Mayfair Theater in Queens, New York. He was subsequently indicted and charged with obscenity in the first and second degrees. The trial court dismissed the first degree count at the close of the evidence. The prosecution of this case arises out of the exhibition of a 65-minute color motion picture entitled "Lickity Split". It can be liberally described as the adventures of a soldier hitchhiking back to Fort Dix at the end of his leave. The film portrays various personal encounters he has during his trip, almost all of which result in explicit sexual activity. At the time of defendant's arrest, the police were waiting in the lobby of the theater. They had arrived at the theater at about noon and were admitted by a janitor. They were there to execute a search warrant calling for the seizure of the film. Shortly thereafter, defendant arrived at the closed theater. The police officers, wishing to keep the area secure while awaiting the manager, asked defendant what he was doing there. When defendant responded that he was waiting for the manager, the police left him alone in the outer lobby. Shortly thereafter, defendant entered the inner lobby and made a telephone call from a public phone. When he left the phone booth, one of the police officers identified himself as such and asked defendant who he was. Defendant replied: "I'm Lou Ciampa." The officer then asked: "You mean from LAC Films?" Defendant

replied: "Yes". The officer, recognizing the name from his part in a continuing investigation, then called his precinct and, after speaking with a superior officer, arrested defendant. Immediately, the officer read defendant his *Miranda* warnings. After each one, defendant affirmatively indicated that he understood. Defendant then asked to call his attorney, and he placed a call from the telephone booth in the theater lobby. The police continued to remain in the theater awaiting the arrival of the manager. Defendant inquired of the police the reason for the delay in departing. When he was told by the police that they were waiting to arrest the manager, defendant stated: "How come you're arresting the manager, it's my film." Later that afternoon, defendant was transported to the police station by two of the officers who had been at the theater. During the drive, the police and defendant engaged in conversation about "people in the industry". Defendant said he had just returned from Las Vegas and the conversation turned to Linda Lovelace and Marilyn Chambers. At this time defendant, not in response to any question, stated: "Why did you bust me? How come you busted me now? I'm just starting to make money with this film." On this appeal, defendant, *inter alia,* raises the issue of the admissibility of these statements. Defendant argues that the first of the above statements should have been suppressed because it was made while he was under restraint and prior to his having been read his constitutional rights. The facts in the record do not support this contention. The police testified that they did not even know who defendant was at the time he entered the lobby. It was only after defendant entered the inner lobby of the theater and placed a telephone call that the police inquired as to his name. At that point defendant was not a suspect, nor was he under any restraint. He was not named in the search warrant. He was apprehended only after the police officer called his superior officer at the precinct. The affirmative response of defendant to the question, "You mean from LAC Films?", was a spontaneous statement. At worst, it was an attempt by the police to confirm the identity of defendant. Defendant argues that the second of his above statements should have been suppressed because, when he asked to call his attorney, he clearly expressed a desire not to be interrogated. Such an inference could properly be drawn from such a request; however, the statement defendant made to the police was not the result of any custodial interrogation. The testimony clearly shows that defendant voluntarily and spontaneously spoke after the police responded to *his* question. The conversation with defendant in the patrol car on the way to the station house was, concededly, improper. However, the statement by defendant in the car was not in response to any questioning by the police, nor was it related to the topic of conversation at the time. Accordingly, the three statements made by defendant to the police were all properly admitted into evidence as voluntary, unsolicited, or spontaneous statements (see *People v Torres,* 21 NY2d 49). In addition to these statements, there was other evidence adduced at the trial to support a finding that defendant did promote the film (see Penal Law, § 235.05, subd 1); for example, the account card listing the film and the theater, which was found at defendant's home. The second element of the crime of obscenity in the second degree is that the material which is promoted be obscene. Section 235.00 (subd 1) of the New York Penal Law defines "obscene" as follows: " 'Obscene.' Any material or performance is 'obscene' if (a) the average person, applying contemporary community standards, would find that considered as a whole, its predominant appeal is to the prurient interest in sex, and (b) it depicts or describes in a patently offensive manner, actual or simulated: sexual intercourse, sodomy, sexual

bestiality, masturbation, sadism, masochism, excretion or lewd exhibition of the genitals, and (c) considered as a whole, it lacks serious literary, artistic, political, and scientific value. Predominant appeal shall be judged with reference to ordinary adults unless it appears from the character of the material or the circumstances of its dissemination to be designed for children or other specially susceptible audience." Sodomy is defined as follows (Penal Law, § 235.00, subd 7): " 'Sodomy' means any of the types of sexual conduct defined in subdivision two of section 130.00 provided, however, that in any prosecution under this article the marital status of the persons engaged in such conduct shall be irrelevant and shall not be considered." Subdivision 2 of section 130.00 of the Penal Law provides: " 'Deviate sexual intercourse' means sexual conduct between persons not married to each other consisting of contact between the penis and the anus, the mouth and penis, or the mouth and the vulva." The film herein explicitly portrays sexual intercourse, fellatio and cunnilingus, all acts "specifically defined by the applicable state law, as written" (see *Miller v California,* 413 US 15, 24; Penal Law, § 235.00, subd 1, par [b]; § 235.00, subd 7). The film depicts a variety of sexual conduct in its most explicit forms. Rarely was anything left to the imagination. Concededly, the film did not depict any sexual conduct other than consensual acts between adults. There was no violence depicted, nor did any of the participants appear to be anything but willing to engage in the conduct portrayed. But a viewing of the film also confirms the finding of the jury (implicit in its verdict) that "the average person, applying contemporary community standards, would find that considered as a whole, its predominant appeal is to the prurient interest in sex" (see Penal Law, § 235.00, subd 1, par [a]). Although the question of appeal to the prurient interest in sex is essentially a question of fact, the judgment of the jury, particularly when it would restrict a defendant's constitutional rights, is subject to " 'the ultimate power of appellate courts to conduct an independent review of constitutional claims when necessary' " *(Jenkins v Georgia,* 418 US 153, 160). Herein, the film sufficiently supports such a finding. Any claim by defendant that the jury is incompetent, initially, to make such a finding upon a proper charge to it, is frivolous. The defense at the trial attempted to prove the serious artistic and scientific value of the film. Defendant had an impressive list of witnesses testifying on his behalf. One was a director of cinematography and lecturer at New York University. One was a professor from John Hopkins University Medical School. One was the host of a phone-in radio talk show. All of defendant's witnesses testified as to the value of the film in their respective fields. Evidently, the jury was not convinced. Our viewing of the film confirms the finding that the film lacks serious artistic or scientific value, contrary to the assertion of defendant (see Penal Law, § 235.00, subd 1, par [c]). Thus, unless there are other grounds upon which to reverse the judgment, the evidence is sufficient to support the finding that the film was promoted by defendant and that it was obscene as defined by statute. Defendant argues that the statute defining obscenity is unconstitutional. Whatever the merit of defendant's argument, the issue has been previously decided by the Supreme Court of the United States (see *Miller v California,* 413 US 15, *supra; Paris Adult Theatre I v Slaton,* 413 US 49; *Kaplan v California,* 413 US 115) and the New York Court of Appeals (see *People v Heller,* 33 NY2d 314). We are bound by those holdings. The definition of obscenity was enacted by the Legislature following the decision of the Supreme Court in *Miller v California (supra).* The revised definition was an effort by the Legislature to conform the State's regulation of obscenity with

the requirements set forth in *Miller,* where the Supreme Court held (p 24): "As a result, we now confine the permissible scope of such regulation to works which depict or describe sexual conduct. That conduct must be specifically defined by the applicable state law, as written or authoritatively construed. A state offense must also be limited to works which, taken as a whole, appeal to the prurient interest in sex, which portray sexual conduct in a patently offensive way, and which, taken as a whole, do not have serious literary, artistic, political, or scientific value." In *People v Heller (supra)* the Court of Appeals upheld the constitutionality of the obscenity statute as it read at the time of the *Miller* decision. The subsequent amendment of the statute by the Legislature brought the present definition of obscenity even closer to the guidelines of *Miller.* Defendant argues that the prosecution failed to meet its burden of proving beyond a reasonable doubt that the film was obscene because it failed to offer any evidence, other than the film itself, to support this conclusion. Defendant similarly argues that, after the presentation of the defense witnesses who testified as to the serious value of the film, the prosecution should have been required to come forward with evidence, other than the film itself, to rebut the defense testimony. We do not agree. Whatever the merits of defendant's argument, if any, the Supreme Court has ruled that the film itself is not only sufficient, but is the best evidence of obscenity (see *Miller v California, supra; Paris Adult Theater I v Slaton, supra; Kaplan v California, supra; Jenkins v Georgia,* 418 US 153, *supra).* In *Paris Adult Theatre I v Slaton (supra),* the two films alleged to be obscene were exhibited to the trial court. The only other State evidence was testimony by criminal investigators that they had paid admission to see the films and that nothing on the outside indicated the full nature of what was shown. The Supreme Court ruled that it was not error to fail to require expert affirmative evidence that the materials were obscene when the materials themselves were actually placed in evidence. The court stated (p 56): "The films, obviously, are the best evidence of what they represent. 'In the cases in which this Court has decided obscenity questions since *Roth [Roth v United States,* 354 US 476], it has regarded the materials as sufficient in themselves for the determination of the question.' *Ginzburg v United States,* 383 U. S. 463, 465". (See, also, *Kaplan v California,* 413 US 115, 121-122, *supra.)* Defendant claims that there were errors in the charge to the jury given by the court. He claims the trial court erred in its definition of "prurient". The trial court defined it "to mean tending to excite lasciviousness, and lasciviousness is defined as tending to arouse sexual desires." Defendant contends that the court should have defined "prurient interest" as denoting a shameful or morbid interest in sex. The definition urged on this court is derived from the American Law Institute's Model Penal Code. The only support for this position comes from a footnote in the *Miller* decision. But therein the court was referring to a definition of obscene, which the New York statute clearly defines. In *Roth v United States* (354 US 476, 487, n 20) the court defined pruriency as the " 'Quality of being prurient; lascivious desire or thought.' " And it is interesting to note that the words "shameful or morbid" were deleted from the definition of obscenity as of September 1, 1974. The trial court did not err in defining prurient as it did. Defendant also contends on appeal that the court was incorrect in its definition of "community standard". The use of a state as the community whose standard is to be used by the jury has been upheld by both the Court of Appeals *(People v Heller,* 33 NY2d 314, *supra* [which concerned New York State]) and the Supreme Court of the United States (see *Miller v California,* 413 US 15, *supra; Hamling v United States,* 418 US

87; *Kaplan v California, supra)*. In any event, no objection was taken to the charge by counsel. Similarly, there is no merit to defendant's argument that by exhibiting the film only to consenting adults he can obtain constitutional immunity. The Supreme Court has stated: "We categorically disapprove the theory * * * that obscene, pornographic films acquire constitutional immunity from state regulation simply because they are exhibited for consenting adults only * * * Although we have often pointedly recognized the high importance of the state interest in regulating the exposure of obscene materials to juveniles and unconsenting adults * * * this Court has never declared these to be the only legitimate state interests permitting regulation of obscene material" *(Paris Adult Theatre I v Slaton,* 413 US 49, 57, *supra)*. Although CPLR 6330 provides a civil proceeding to enjoin the sale or distribution of obscene material, the constitutionality of section 235.05 of the Penal Law has been upheld *(People v Heller, supra)*. This court will not preclude the District Attorney from electing either one of these permissible alternatives to enforce the State's valid policy of regulating obscenity to the extent that such regulation is constitutionally permissible. Accordingly, we affirm the judgment. Martuscello, J. P., Cohalan, Rabin and Mollen, JJ., concur.