OPINION OF THE COURT
David B. Saxe, J.
I. INTRODUCTION
The petitioner, owner of commercial premises located at 31 West 21st Street in New York City has brought this summary proceeding under RPAPL 711 (subd 5) against the respondent tenant, Evening of the Unusual, Inc. The lease between the parties states that the respondent may use the premises “for any lawful purpose”.
RPAPL 711 (subd 5) states in relevant part:
“A special proceeding may be maintained under this article upon the following grounds * * *
“5. The premises, or any part thereof, are used or occupied as a bawdy-house, or house or place of assignation for lewd persons, or for purposes of prostitution, or for any illegal trade or manufacture, or other illegal business.”
The petition alleges various illegal uses of the premises by the respondent, including:
*662 (a) as a place of assignation for lewd persons;
(b) for the production, presentation, or direction of obscene performances in violation of section 235.05 of the Penal Law;
(c) for promoting and/or permitting prostitution (Penal Law, §§ 230.20, 230.25, 230.40).
II. FACTS
The facility known as “Club O” operated by the respondent, “Evening of the Unusual” caters to a clientele interested in sadism and masochism. It was purposely named “Club O” because of the similarity to the title of a French novel, The Story of O, by Pauline Réage which graphically depicts the sadomasochistic saga of a submissive woman. “Club O” is what is commonly known as an “S&M” club.
The respondent’s witnesses, most of whom were employees or patrons of the club, and afficionados of S&M, spoke almost reverently of “Club 0” as a mecca for the exploration of fetishes and role playing. Examples of role playing offered included bondage, spanking, shackling, light beating and feet licking. They described their activities at the club as being consensual and sensual and denied the occurrence of any explicit sexual conduct.
The petitioner produced two witnesses. Dita Sullivan, a science fiction journalist, visited the club on two separate occasions. She alleged that she and her escort were charged $25 to enter the club and signed forms which, in essence, were declarations that they would not engage in prostitution. In return, they received a small membership card and were “buzzed” through the door into the club. Inside, she observed a dimly lit large room divided into a living-room area and a bar area and what appeared to be a show area or dance floor. Within these areas she observed individuals being beaten with whips and masters leading “slaves” around on chains.
She also saw an overweight Caucasion called “Harvey” being lashed and beaten by two women each dressed in leather garb holding large whips. People gathered around — apparently enjoying this event. Throughout the beating, the women screamed “You know when you tell me to stop, I’m only going to beat you harder.”
*663 Ms. Sullivan testified further that she and her escort went into a separate area in the rear of the club containing small semiprivate cubicles. In one cubicle she saw a woman with a collar around her neck being held by her hair by two men who were sodomizing her. A similar scenario, between two men was observed in another cubicle.
Ms. Sullivan testified that she did not participate in any of the activities and, with the exception of one incident, she was not propositioned or confronted by any of the patrons. This one confrontation occurred when she was approached by a man who told her he wanted to be “disciplined” and offered her $100 if she would perform certain explicit sadomasochistic sexual acts upon him. She declined his generous offer.
The petitioner’s second witness, Raymond McCue, is a private investigator. He was paid to testify and prepare reports for the petitioner. On each visit, he, like Ms. Sullivan, paid $25, signed a release form and was given a membership card.
When he entered the club at the time of his first visit there was a show in progress. McCue viewed a man called “Master Ron” who was dressed in a metal-studded leather outfit with handcuffs, chains and whips hanging from his belt. Accompanying Master Ron was a plump woman dressed in only a leather corset and skimpy undergarments, which were later removed, upon whom he was performing various acts for an audience of approximately 40 onlookers. The audience cheered and applauded.
McCue also observed various acts involving female domination of men. One woman fashionably dressed in studded leather led her two naked male slaves around with chains and leashes. She lashed their bodies forcefully with her leather whips, kneaded the flesh of their buttocks and also sensually stroked their genitals with her whip. Other submissive nude males were observed licking the feet of their dominant mistresses.
Mr. McCue stated that he was never propositioned or solicited for sexual acts, nor was he ever prevented from leaving.
*664 The respondent produced as the first witness its president, Judith Feldman. Ms. Feldman would generally sit at the entrance booth to Club 0 and collect the entrance fee from patrons. With respect to the criteria for gaining entrance to the club, she stated that there were no formal requirements; that she would use her personal judgment excluding persons known to be prostitutes or persons that appeared to be too young. The only “membership list” came from the names signed on the release forms.
She characterized Club O as a place where persons go to discuss their fetishes. She denied that persons engaged in sexual activities on the premises and she further stated that the respondent does not stage performances — that any performances or role playing that occur are purely spontaneous by the patrons.
In response to this denial, Ms. Feldman was confronted with various advertisements placed in the Village Voice for Club 0 containing phrases such as “Live Stage Performances”, “swinging”, “on the fringe of sex” and “Virtually any sexual variations between consenting adults is permitted by the club”. Feldman denied that any of these acts occurred at Club O, but failed to offer any adequate explanations as to why she would run these advertisements unless they were in fact true characterizations of what transpired there.
Lois Giannacopoulos, the manager and social director of Club O stated that people go there to partake in S&M and that bondage, shackling, role playing and spanking, and other similar activities, are regular occurrences there. She stated that she has personally enjoyed S&M for many years and finds it pleasurable and “I see nothing wrong with biting someone on the buttocks”.
John Hand, a frequent patron at Club 0 also testified for the respondent. He characterized himself as a dominant-submissive and stated that he often leads his “friends” around on chains at Club O. As to his own preferences, he stated “I don’t do feet, armpits or navels”.
Hand stated that most people go there not only because they personally enjoy S&M but also to see their friends who have similar predilections. He likened the role playing *665 that occurs there to psychodrama noting that while it may look violent, it really isn’t.
When asked as to the frequency of sexual activity at Club O, he stated that he had visited Club 0 approximately 50 times in the past year and that he had engaged in sexual intercourse in the back cubicles approximately 10 or 12 times during that time period.
Betsy Waldinger, known as “Buzz” is employed by the respondent as bartender and testified that she preferred to dominate other women and spoke of her “collection of whips”.
Ms. Waldinger described the game of puppies and ponies as an example of role playing: “They like to come in and just pretend that they’re puppies, you know, to scratch them behind the ears and they go fetch for those little plastic pork chops, whatever. Well, it’s funny but it’s serious, but it’s a little game. And we have horse races. They like to come in and pretend they’re ponies, and they race back and forth across the club”.
She emphasized that pain was not inflicted in any degree. However, she said: “if you really would come to me and you put your butt up in the air and you say ‘mistress, would you spank me’, you better believe I’m going to spank you”.
III. DISCUSSION OF THE LAW
Petitioner has asserted various grounds upon which it contends it is entitled to a judgment of eviction. Only the issues concerning whether the respondent maintains a house of assignation for lewd persons (RPAPL 711, subd 5) and/or stages obscene performances (Penal Law, § 235.05) as well as respondent’s assertion of a constitutionally protected right of privacy as a defense are addressed herein.
a. Place of Assignation for Lewd Persons
The petitioner contends that the respondent has used the premises as a place of assignation for lewd persons. (RPAPL 711, subd 5.) The respondent states that the term “house or place of assignation for lewd persons” is designed to mean a bawdy house, whorehouse, or house resorted for purposes of prostitution and does not apply to respondent’s *666 premises where there is no proof of sale of sex or sexual activity in return for payment.
Each side has consulted and quoted the dictionary that best supports their respective position. Incorporating the many definitions of assignation along with those of lewd or lewdness I hold that the term “house * * * of assignation for lewd persons” is not limited solely to conventional houses of prostitution but may also include facilities where patrons pay an admission fee in order to, among other things, engage in various forms of sexual conduct and which encourage and permit virtually any sexual variation between consenting adults. I thus find that “house * * * of assignation for lewd persons” has a separate meaning apart from the prostitution-related definitions also contained in RPAPL 711 (subd 5). The term “assignation” must be interpreted not in isolation but in conjunction with the term “lewd”.
The respondent contends that this case is similar to Edwards v “Roe” (68 Misc 2d 278) which involved a proceeding under RPAPL 711 (subd 5) to evict a tenant from her residence based on the fact that she was engaging in an adulterous relationship. The respondent quotes Judge Irving Younger’s decision at length to support the proposition that any and all consensual sexual conduct not harmful to others and not involving either disorder, or prostitution is protected behavior and may not constitute a basis for eviction under RPAPL 711 (subd 5).
The respondent’s interpretation of Edwards v “Roe” (supra) is too broad. That decision was based on concepts of privacy in the home[1] rather than on broad notions of freedom to engage in sexual activities wherever and whenever one pleases. Also, for reasons discussed at a later point in this opinion,[2] I reject respondent’s insistence that it maintains a private establishment and is entitled to raise certain constitutional rights of privacy on behalf of its patrons. The fact is, that respondent is a commercial establishment and the holding in Edwards v “Roe” (supra) as I read it, is to the effect that RPAPL 711 (subd 5) should not *667 be used to evict a tenant for his or her private sexual conduct in a purely residential setting. Since the respondent occupies the premises pursuant to a commercial lease and maintains a commercial enterprise there, I find that Edwards v "Roe” (supra) does not support the respondent’s position.
Did the petitioner establish that the type of sadomasochistic conduct engaged in by the patrons of respondent’s establishment constitutes sexual conduct and, if so, does it rise to a level sufficient to support a holding that respondent maintains a house of assignation for lewd persons?
The respondent’s witnesses repeatedly described their spankings, whippings, bondage, and the like, to be sensual, erotic or foreplay forms of behavior as opposed to explicit sexual conduct. However, the testimony supports the conclusion that the sadomasochistic conduct at Club O did not occur in isolation, but rather was so necessarily intertwined with sexual conduct (such as exposure and fondling of the genital areas, and although disputed, sodomy, sexual intercourse and the use of dildos) as to render the sadomasochism inseparable from the sexual conduct. Under the circumstances of this case, it is impossible to delineate when the sadism and masochism ended and when the sex began. Nor is that necessary because I hold that, at least at Club 0, there is little if any difference between sex and sadomasochism.
Certainly, the record supports a holding that the premises constitute a place of assignation for lewd persons. The testimony, taken as a whole, supports the conclusion that a wide variety of sexual activity takes place at respondent’s premises. John Hand, respondent’s witness, testified that over the last year he had had sex on the premises approximately 10 to 12 times. Advertisements, regularly placed by the respondent in the Village Voice included the following descriptions: “Swinging and bizarre and unusual partying” as well as “virtually any sexual variation between consenting adults is permitted”. Further, the incidents viewed and testified to by the petitioner’s witnesses, which included the beating of “Harvey” while he masturbated; the whipping of a woman’s bare buttocks by “Master Ron” followed by the use of various sexual paraphernalia upon her, and *668 the scenes of sodomy in the cubicle are all believed as credible by this court and representative of the conduct that regularly and systematically takes place at Club 0. Whether it is straight heterosexual intercourse or of the somewhat deviant variety of sexual behavior evidenced at Club O, I hold that they are one and the same for the purposes of establishing a case under RPAPL 711 (subd 5). Based on all of the above, I conclude that while Club O may not be a typical sex club, it is close enough and constitutes a place of assignation for lewd persons.
b. Prostitution
As another ground for eviction, petitioner contends that the respondent has permitted or promoted prostitution on the premises in violation of sections 230.40, 230.20 and 230.25 of the Penal Law of this State.
After trial, I find that petitioner has failed to establish that prostitution, in its commonly understood meaning, occurs on the premises. (See People v Costello, 90 Misc 2d 431.)
The petitioner presents an alternative theory. The petitioner argues that the respondent is permitting or promoting prostitution by accepting money at the door in the form of an entrance fee, in return for which the patrons enter the club and are permitted to engage in various forms of sexual conduct. I reject petitioner’s theory as being beyond the intended scope of behavior which may be categorized as prostitution.
In People v Kovner (96 Misc 2d 414) a broader definition of prostitution was adopted. There, the court found that the producer of various pornographic films may be guilty of promoting prostitution if he advances or profits from the hiring of actors and actresses for the purpose of filming them engaged in explicit sexual conduct. The court stated (p 417): “Neither the statute itself (Penal Law, § 230.00), nor any decisions interpreting it, exclude explicit sexual conduct by a paid performer from the definition of prostitution, that the fee paid for the sexual activity was provided by a nonparticipant or that the defendant’s object was to photograph the activity creates no legal distinction.”
*669 Here, although there is overwhelming proof of sexual conduct on the premises, the connection between the passing of money and the return of sexual conduct is not nearly as direct as was the case in People v Kovner (supra). I find the facts presented here to be insufficient to support a holding that the respondent promotes or permits prostitution.
Accordingly, the portions of the petition alleging the commission of prostitution-related offenses by the respondent are dismissed.
c. Obscenity
The petitioner contends that the respondent has violated the obscenity laws of this State thus constituting a separate ground for eviction under RPAPL 711 (subd 5) which provides for eviction upon proof of “illegal trade or manufacture, or other illegal business”.
Subdivision 2 of section 235.05 of the Penal Law provides, in relevant part:
“A person is guilty of obscenity in the third degree when, knowing its content and character, he * * *
“Produces, presents or directs an obscene performance”.
“Performance” is defined in subdivision 3 of section 235.00 of the Penal Law as: “any play, motion picture, dance or other exhibition performed before an audience.”
“Obscene” is defined by subdivision 1 of section 235.00 of the Penal Law as: “Any material or performance is ‘obscene’ if (a) the average person, applying contemporary community standards, would find that considered as a whole, its predominant appeal is to the prurient interest in sex, and (b) it depicts or describes in a patently offensive manner, actual or simulated: sexual intercourse, sodomy, sexual bestiality, masturbation, sadism, masochism, excretion or lewd exhibition of the genitals, and (c) considered as a whole, it lacks serious literary, artistic, political, and scientific value. Predominant appeal shall be judged with reference to ordinary adults unless it appears from the character of the material or the circumstances of its dissemination to be designed for children or other specially susceptible audience.”
*670 This definition of obscenity was enacted by the Legislature to conform with the requirements and guidelines set down in Miller v California (413 US 15, reh den 414 US 881). The Miller decision is most notable for (a) its reaffirmation of the rule that obscene material is not protected by the First Amendment, and (b) its rejection of the rule set down in previous cases that a State must prove a work to be “utterly without redeeming social value” in order to be considered obscene (Memoirs v Massachusetts, 383 US 413; Roth v United States, 354 US 476), and (c) for its adoption of a State-wide community standard from which to judge whether a given work is obscene.
The New York State obscenity statute has been held to be sufficiently specific and constitutional. (People v Heller, 33 NY2d 314, cert den sub nom. Buckley v New York, 418 US 944.)
1. Would the average person, applying contemporary community standards, find that, considered as a whole, Club O predominantly appeals to the prurient interest in sex?
First, the term contemporary community standard has been interpreted to mean the contemporary standard of communities on a State-wide basis. (People v Heller, supra; People v Calbud, Inc., 49 NY2d 389.) Thus, the respondent’s objection that one of petitioner’s witnesses was incompetent to testify because he resided in a close-knit community in New York State, but outside the fast-paced, anything-goes-type atmosphere of the City of New York, is of no moment. (See, generally, People v Hausman, 82 Misc 2d 1032; People v Ventrice, 96 Misc 2d 282.)
As to the meaning attributed to the term “prurient interest in sex”, one case defined it as “ ‘tending to excite lasciviousness’ ”, and “lasciviousness” as “ ‘tending to arouse sexual desires’”. (People v Ciampa, 57 AD2d 932, 935.) That court rejected the defendant’s contention that prurient should have been defined as denoting “a shameful or morbid interest in sex” {supra, at p 935).
The court in People v Heller (33 NY2d 314, 327, supra) stated: “When sex and nudity, and the other sorts of prohibited conduct for that matter, are exploited substantially beyond customary limits of candor and would, as the *671 average man views it, be the predominant element in the material so as to appeal, again predominantly, to lascivious cravings, then there can be no doubt as to what is prohibited.”
In the preceding section entitled “Place of Assignation for Lewd Persons”,[3] I discussed the types of sexual and sadomasochistic activities that regularly occur at Club O. Moreover, I also focused upon the witnesses’ descriptions of the performances that are staged there and concluded that the sadomasochistic conduct is so necessarily intertwined with the sexual conduct at Club O so as to make the two inseparable and virtually synonymous. The same facts also lead to the conclusion that the activities at respondent’s premises, considered as a whole, appeal predominantly to the prurient interest in sex.
2. Do the activities depict in a patently offensive manner, actual or simulated sexual intercourse, sodomy, sexual bestiality, masturbation, sadism, masochism, excretion or lewd exhibition of the genitals?
In People v Ventrice (supra) the manager and two dancers of a club were charged with obscenity based on the allegedly obscene performance by the two dancers. The court held that the defendants were not guilty — that nudity per se, or nude dancing does not necessarily constitute obscene behavior: “‘[njudity in itself and without lewdness or dirtiness is not obscenity in law or common sense * * * For more than a century the New York courts have held that exposure of the body to the view of others is not criminal if there be no lewd intent.’ ” (96 Misc 2d 282, 286, supra.)
Recognizing the difficulty of delineating between obscenity and protected expression the court in Ventrice sought to draw the line. (See, also, People v Bercowitz, 61 Misc 2d 974.) The court distinguished between cases such as those involving topless dancing, which have achieved some degree of protection under the First Amendment (Salem Inn v Frank, 522 F2d 1045 [CA2d]), and those cases involving graphic depiction or simulation of sexual acts which have been held to be obscene. The court explained: *672 “[4] Where genitalia have been graphically portrayed, together with some indication of sexual activity, e.g., sexual intercourse, masturbation or sodomy, absent social justification or excuse, the material in question has been held obscene. However, the graphic representation of genitalia, without more, is not a violation of the obscenity statute. Where there is merely nudity or exposure of the genitals absent any accompánying lewdness or a lewd act, there is no obscenity and the freedom of expression is protected. (People v Clark, 60 Misc 2d 1073,1074).” (People v Ventrice, supra, at p 287; see, also, People v Abronovitz, 62 Misc 2d 1069, affd in part, revd in part on other grounds 38 AD2d 681, revd on other grounds 31 NY2d 160.)
Without hesitation, I find that the conduct at the respondent’s premises depicts sexual intercourse, sodomy, sadism and masochism in a lewd and patently offensive manner. First, based on the testimony at trial, it is clear that sexual intercourse, on display for other patrons to see, or in the back “semiprivate” cubicles of the club, is a common occurrence at the club. The testimony further established the frequent use of sadomasochistic and sexual paraphernalia in conjunction with the performances and the role playing which were encouraged and sponsored by the respondent. These activities included various forms of sexual exhibition and sodomy as well as sadomasochistic behavior such as bondage, spanking and whipping. Some of these shows were planned, others were spontaneous. It also appears that the audience was encouraged to, and often did, participate in these somewhat bizarre events. While this all may be enjoyable to the patrons of Club O, I hold that, applying the relevant standard — the activities taken as a whole at Club O are patently offensive to the average contemporary New Yorker.
3. Considered as a whole, do the activities at Club O lack serious literary, artistic, political or scientific value?
As previously stated, the Supreme Court in Miller v California (supra) discarded the “utterly without redeeming social value” standard and adopted the standard that a work taken as a whole, lacks serious literary, artistic, or political or scientific value. This change was made because it was almost impossible to prove that any material was *673 “unqualifiedly worthless”. (People v Heller, 33 NY2d 314, 321, supra.) Thus, under the current standard: “the effectuation of a pretense as a serious work will not save the material from being found obscene if, in fact, it is dominated by patently offensive sexual material clearly geared for a market made up of those who would have no use for it other than to satisfy their lewd, lascivious or morbid desires and cravings” (supra, at p 321).
The witnesses for the respondent each testified that, in their opinion, they found the. activities of Club O to have serious literary and artistic value. Ms. Giannacopoulos, an employee for the respondent discussed one performance in particular. She stated: “It was a performance, we’ll say it was the seventeen, eighteen hundreds. There were I’m pretty sure, two guys and one woman or two women, and they were dressed in robes * * * It was done very professionally, and they sort of dragged her across the room and she was yelling, you know very professionally done * * * It was very professional. And she ended up with a spanking.”
The respondent’s witnesses emphasized that the club served an important function as a gathering place and that, to them, this purpose was much more important than the sexual conduct. Nevertheless, upon analysis, I cannot accept that there are any nominally serious values — be it artistic, literary or otherwise — that are fostered by Club O. Plain and simple, the club lacks any serious literary, artistic, political or scientific values.
Based on the above discussion, I find that each of the elements under the obscenity statute as defined by subdivision 1 of section 235.00 of the Penal Law (i.e., appeal to prurient interest, patently offensive, and lacking serious value) has been satisfied.
4. Does respondent produce, present or direct the performances?
Finally, the respondent contends that it does not “produce * * * present * * * or direct” any performances within the meaning of subdivision 2 of section 235.05 of the Penal Law. In essence, it is Ms. Feldman’s testimony that any shows or performances which occur at Club 0 are spontaneous performances or role playing and not done at her *674 direction or suggestion. Consequently, she maintains that the respondent cannot be held responsible and cannot be found to have violated the obscenity statute in question.
I reject this contention. First, respondent’s own advertisements in the Village Voice advertised “Live Performances”. Moreover, the testimony of all witnesses confirmed the regularity of shows performed on the premises, in a stage area. Contrary to respondent’s contention, it is clear that respondents produced many of the performances at Club O. The shows not technically directed by the respondent were encouraged by the establishment sufficient to support a finding that the respondent produced, presented or directed obscene performances under section 235.05 of the Penal Law.
I thus find that petitioner has established that the respondent has violated the obscenity laws in question, therefore constituting an “illegal act” within the meaning of RPAPL 711 (subd 5).
d. Right of Privacy
Respondent contends that an eviction under RPAPL 711 (subd 5) on either the ground that it maintains a place of assignation for lewd persons or on the ground of obscenity would be an infringement of its and of its patrons’ fundamental constitutional rights of due process and privacy. In particular, respondent maintains that because Club 0 is a private membership club, the sadomasochistic and sexual activities of its patrons on the premises are protected forms of expression under the United States Constitution as enunciated in Griswold v Connecticut (381 US 479) and Stanley v Georgia (394 US 557).
In Griswold v Connecticut (supra) the Supreme Court held that a statute which made it a crime to use contraceptives, or aid or abet another using them was unconstitutional because the statute infringed upon a constitutionally protected zone of marital privacy. The court considered the State’s attempt at proscribing the sale of contraceptives to be too significant a degree of intrusion into the private marital relations of its citizens. Following Griswold, a number of cases have been decided in which the Supreme Court has further elaborated or defined the *675 boundaries of the constitutionally protected “zone of privacy”. A number of them have dealt specifically with the regulation of obscenity and those are of specific relevance here.
In Stanley v Georgia (supra) the defendant was convicted of knowingly possessing obscene materials based on an obscene film found by Georgia police authorities in the bedroom of his home. The defendant contended that the “Georgia obscenity statute, insofar as it punishes mere private possession of obscene matter, violates the First Amendment, as made applicable to the States by the Fourteenth Amendment”. (394 US, at p 559.) The Supreme Court agreed holding that “the First and Fourteenth Amendments prohibit making mere private possession of obscene material a crime.” (395 US, at p 568.)
The court in Stanley v Georgia (supra) recognized the basic rule that obscenity is not protected by the First Amendment (Roth v United States, 354 US 476, supra), but qualified that holding in light of a person’s right of privacy to receive information and be free from governmental intrusion in his own home. The court thus stated “Roth and its progeny certainly do mean that the First and Fourteenth Amendments recognize a valid governmental interest in dealing with the problem of obscenity. But the assertion of that interest cannot, in every context, be insulated from all constitutional protections.” (Stanley v Georgia, 394 US, at p 563.)
The court in Stanley (supra) considered the various interests at stake and concluded that: “Whatever may be the justifications for other statutes regulating obscenity, we do not think they reach into the privacy of one’s home. If the First Amendment means anything, it means that a State has no business telling a man, sitting alone in his own house, what books he may read or what films he may watch. Our whole constitutional heritage rebels at the thought of giving government the power to control men’s minds.” (394 US, at p 565.)
In United States v Reidel (402 US 351, reh den 403 US 924), as well as in later cases, the Supreme Court has determined that despite an individual’s constitutional right to possess obscene materials in the privacy of his *676 home, there is no correlative right to facilitate such private possession by the manufacture, sale or transportation of obscene materials. In Reidel, the defendant distributed illustrated pamphlets through the mails entitled “The True Facts About Imported Pornography”. The Supreme Court rejected the defendant’s argument that he could not be punished for commercially distributing pornography through the mails because he was merely delivering the obscene materials to persons who have the right to receive and possess them. The court stated: “Nothing in Stanley questioned the validity of Roth insofar as the distribution of obscene material was concerned. Clearly the Court had no thought of questioning the validity of [the relevant statute] as applied to those who, like Reidel, are routinely disseminating obscenity through the mails and who have no claim, and could make none, about unwanted governmental intrusions into the privacy of their home.” (402 US, at pp 354-355; emphasis added.)
United States v Orito (413 US 139) and United States v 12 200-Ft. Reels of Film (413 US 123) further limit the scope of the zone of privacy enunciated in Stanley v Georgia (supra) as not extending beyond the confines of the home. United States v 12 200-Ft. Reels of Film (supra) involved a forfeiture action and concerned a quantity of film being imported into this country from Mexico purportedly for private, noncommercial use. The Supreme Court framed the issue as follows: “The narrow issue directly presented in this case * * * is whether the United States may constitutionally prohibit importation of obscene material which the importer claims is for private, personal use and possession only.” (413 US, at p 125.) The claimant asserted that his importation into this country of obscene materials was constitutionally protected because they were intended for private use. The Supreme Court disagreed stating that the holding in Stanley was based “not on any First Amendment right to purchase or possess obscene materials, but on the right to privacy in the home”. (413 US, at p 126.)
Similarly, in United States v Orito (supra) the defendant contended that a Federal statute, which proscribes the transportation of obscene materials across State lines was unconstitutional insofar as it failed to distinguish between *677 private (noncommercial) and public (commercial) transportation of obscene materials. The Supreme Court disagreed stating: “Given (a) that obscene material is not protected under the First Amendment * * * (b) that the Government has a legitimate interest in protecting the public commercial environment by preventing such material from entering the stream of commerce * * * and (c) that no constitutionally protected privacy is involved * * * we cannot say that the Constitution forbids comprehensive federal regulation of interstate transportation of obscene material merely because such transport may be by private carriage, or because the material is intended for the private use of the transporter”. (413 US, at p 143.)
Accordingly, the Supreme Court upheld the statute in question concluding that the transportation of obscene materials, even if done in private vehicles and intended solely for private use, may constitutionally be proscribed.
Thus, the cases establish that, although a person cannot be punished for mere private possession of obscene materials in his home, there is no corresponding right to engage in commerce in obscene materials even if intended solely for private, noncommercial use. The basis upon which Stanley v Georgia (supra) was decided, as these cases make clear, is upon the right or privacy in one’s home. These cases “negate the idea that some zone of constitutionally protected privacy follows such material when it is moved outside the home area”. (United States v Orito, 413 US, at pp 141-142.)
The court in Orito (supra) differentiated the holdings with regard to obscenity in contrast to those dealing with marital rights. In the marital rights cases, the zone of protection afforded individuals asserting that right has been construed as much broader: “The Constitution extends special safeguards to the privacy of the home, just as it protects other special privacy rights such as those of marriage, procreation, motherhood, child rearing, and education * * * But viewing obscene films in a commercial theater open to the adult public * * * or transporting such films in common carriers in interstate commerce, has no claim to such special consideration. It is hardly necessary to catalogue the myriad activities that may be lawfully *678 conducted within the privacy and confines of the home, but may be prohibited in public * * * The Government has a legitimate interest in protecting the public commercial environment by preventing [obscene] material from entering the stream of commerce”. (413 US, at pp 142-143.)
In Paris Adult Theatre I v Slaton (413 US 49, reh den 414 US 881) the District Attorney tried to enjoin two movie theatres in Atlanta, Georgia, from exhibiting two allegedly obscene films. The trial court dismissed the complaint stating: “ Tt appears to the Court that the display of these films in a commercial theatre, when surrounded by requisite notice to the public of their nature and by reasonable protection against the exposure of these films to minors, is constitutionally permissible.’ ” (413 US, at p 53.)
The Georgia Supreme Court reached the opposite conclusion and unanimously reversed the decision of the trial court. The court viewed Stanley v Georgia (supra) as inapposite since that holding was based on a right of privacy in the home and did not deal with the issue of commercial exploitation of obscenity.
The United States Supreme Court affirmed the Georgia Supreme Court. The court held: “In this case we hold that the States have a legitimate interest in regulating commerce in obscene material and in regulating exhibition of obscene material in places of public accommodation, including so-called ‘adult’ theaters from which minors are excluded. In light of these holdings, nothing precludes the State of Georgia from the regulation of the allegedly obscene material exhibited in Paris Adult Theatre I or II, provided that the applicable Georgia law * * * meets the First Amendment standards set forth in Miller v. California”. (413 US, at p 69.)
The theatre owners in Paris (supra) raised many of the same arguments as the respondent has raised here. Specifically, it was urged that the activities in question acquired constitutional protection based on notions of privacy, free will and consent. The Supreme Court rejected each of these grounds.
The first argument advanced by the respondent, Club O, is that their patrons’ activities acquire constitutional immunity because their participation is consensual. Respon *679 dent repeatedly reiterates that nothing at Club O is done to people against their will.
The Paris court considered this argument and stated: “We categorically disapprove the theory * * * that obscene, pornographic films acquire constitutional immunity from state regulation simply because they are exhibited for consenting adults only * * * In particular, we hold that there are legitimate state interests at stake in stemming the tide of commercialized obscenity, even assuming it is feasible to enforce effective safeguards against exposure to juveniles and to passersby.” (413 US, at pp 57-58.)
In a similar vein, respondent argues that the First Amendment protects their right of “free will”. Thus a holding in the petitioner’s favor, they assert, would hamper their rights of individual free choice. The Supreme Court was also faced with this argument in Paris and rejected it. They noted: “We do indeed base our society on certain assumptions that people have the capacity for free choice. Most exercises of individual free choice — those in politics, religion, and expression of ideas — are explicitly protected by the Constitution. Totally unlimited play for free will, however, is not allowed in our or any other society * * * The States, of course, may follow such a ‘laissez-faire’ policy and drop all controls on commercialized obscenity * * * but nothing in the Constitution compels the States to do so with regard to matters falling within state jurisdiction.” (413 US, at pp 63-64.)
Finally, the theater owners in Paris (supra) contended that State regulation of access by consenting adults to obscene material violated the constitutionally protected right to privacy enjoyed by their customers. The court found this argument unconvincing: “Even assuming that petitioners have vicarious standing to assert potential customers’ rights, it is unavailing to compare a theater, open to the public for a fee, with the private home of Stanley v. Georgia”. (413 US, at p 65.)
The court proceeded to analyze prior decisions which recognized a right of privacy guaranteed by the Fourteenth Amendment and explained that this right arises only with respect to “personal rights that can be deemed ‘fundamental or implicit in the concept of ordered liberty’ ”. (413 US, *680 at p 65.) The court explained that this right protects the personal intimacies of the home, the family, marriage, motherhood, procreation and child rearing but concluded: “Nothing, however, in this Court’s decisions intimates that there is any ‘fundamental’ privacy right ‘implicit in the concept of ordered liberty’ to watch obscene movies in places of public accommodation.” (413 US, at p 66.)
Thus, the rule in Stanley v Georgia (394 US 557, supra) is confined to a person’s right of privacy in the home and is not analogous to a right generally to engage in or be a private recipient of the commercial exploitation of obscenity. The court stated: “If obscene material unprotected by the First Amendment in itself carried with it a ‘penumbra’ of constitutionally protected privacy, this Court would not have found it necessary to decide Stanley on the narrow basis of the ‘privacy of the home,’ which was hardly more than a reaffirmation that ‘a man’s home is his castle’ * * * The idea of a ‘privacy’ right and a place of public accommodation are, in this context, mutually exclusive.” (Paris Adult Theatre I v Slaton, 413 US, at pp 66-67.)
Respondent attempts to remove itself from the broad reach of the Paris case by strenuously contending that Club 0 is a private membership club which is not a “public accommodation”, but rather “private” within the meaning of Stanley v Georgia (supra). This distinction, it is argued, compels the result that the activities which transpire at Club O, be they obscene or otherwise, are within the protected zone of privacy.
I find this argument unpersuasive.
A review of the facts reveals that Club O is no more a private accommodation than were the movie theatres in Paris Adult Theatre I v Slaton (supra). Respondent has no real criteria for membership in its club. The fact that advertisements to the public were regularly placed by the respondent in the Village Voice, a weekly newspaper publication widely circulated throughout the New York City area, supports the opposite conclusion. Further, no actual list for membership at the club is maintained by the respondent. Instead, anyone who appears at the front door of Club 0 and pays the entrance fee is freely admitted to *681 the club. I conclude therefore that the respondent maintains a commercial establishment open to the public and not a private membership club.
While it may be true that if the respondent’s premises were analogous to a private residence and not a commercial facility the activities that transpire there might be considered protected and immune from either a State prosecution or a landlord’s eviction proceeding, I hold that respondent operates a commercial facility which is devoid of the type of constitutional protection urged by respondent.
Accordingly, I hold that petitioner has established that respondent maintains a place of assignation for lewd persons within the meaning of RPAPL 711 (subd 5) and further that respondent has violated the criminal obscenity statutes (Penal Law, § 235.05), thus supporting an independent basis for eviction under RPAPL 711 (subd 5). I further hold that based on the above discussion of cases, there is no constitutional impediment based on respondent’s rights or privacy to granting a judgment of eviction in favor of the petitioner.
IV. CONCLUSION
Based on my prior analysis, I find that the petitioner is entitled to a judgment of eviction based on the respondent’s violation of RPAPL 711 (subd 5) insofar as it staged obscene performances and maintained a house of assignation for lewd persons. The warrant of eviction shall issue forthwith a 20-day stay of execution. Petitioner is also awarded the costs and disbursements of this action.

. See section D, Right of Privacy (infra).

. See section D, Right of Privacy (infra) and particularly this court’s discussion pertaining to Paris Adult Theatre I v Slaton (413 US 49, reh den 414 US 881).

. See section A (supra).